**FORD MOTOR COMPANY, Plaintiff,**

v.

**Robert LANE d/b/a Warner Publications, Defendant.**

**No. 99–74205.**

United States District Court,
E.D. Michigan,
Southern Division.

Sept. 7, 1999.

Ernie L. Brooks, Robert C. Tuttle, Frank A. Angileri, Brooks & Kishman, Southfield, MI, for Ford Motor Co.

## ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

EDMUNDS, District Judge.

Thirty years ago, on September 2, 1969, computer scientists at UCLA introduced a system which allowed one computer to speak to another. The birth of the Internet, inauspicious at the time, presaged a revolution in worldwide communications. In the realm of law, we are only beginning to grapple with the impact of the communications revolution, and this case represents just one part of one skirmish—a clash between our commitment to the freedom of speech and the press, and our dedication to the protection of commercial innovation and intellectual property. In this case, the battle is won by the First Amendment.

This matter is before the Court on Plaintiff's Motion for a Preliminary Injunction.[1] Although Defendant has stipulated to certain provisions of the injunction, including a prohibition on the infringing publication of copyrighted materials, Defendant challenges the provision which would enjoin him from using, copying, or disclosing any internal document of Ford Motor Company (including information contained therein). Plaintiff also seeks to enjoin Defendant from using Ford's logo on his website. For the reasons set forth below, this Court finds that, although Ford has presented substantial evidence to support its claim that Lane violated the Michigan Uniform Trade Secrets Act, an injunction restraining Defendant's publication of Ford's trade secrets would constitute an invalid prior restraint of free speech in violation of the First Amendment. Thus, Plaintiff's motion for a preliminary injunction enjoining Defendant's use, copying, or disclosing of Plaintiff's internal documents is DENIED.

## I. Facts

Plaintiff, Ford Motor Company, is an internationally-known automobile manufacturer. Ford closely guards its strategic, marketing, and product development plans. These plans are "trade secrets," which include program structures and vehicle cycle plans, engineering data, profitability and pricing data, and blueprints for manufacturing vehicles and their parts.

---

1. A Temporary Restraining Order was issued by the presiding judge, in this Court's absence, on August 25, 1999.

Also, Ford owns numerous copyrights in material "made for hire" under the Copyright Act. In addition, Ford owns over 100 trademark registrations for the name "FORD," including the widely recognized stylized version of the name "FORD" (cursive font) and the "FORD OVAL" mark (cursive font inside a blue oval). The FORD mark has been in use since 1895.

Defendant, Robert Lane, is a student. Doing business as Warner Publications, he publishes a website with the domain name "*blueovalnews.com,*" formerly "*fordworldnews.com.*" The website publishes information about Ford and its products on the Internet, and has featured the Ford blue oval mark. Affidavit of Nancy Oatley, Ex. A. Some time prior to the events at issue in this case, Lane applied for and received authorization to access Ford's press release website. Transcript of Aug. 30, 1999 hearing at 36 [hereinafter cited as "Tr. at ——"].

In the fall of 1998, Ford became aware of Lane's website, which then operated under the domain name *fordworldnews.com.* Ford objected to Lane's use of the name "Ford" as part of the domain name and blocked Lane's access to Ford's press release website. In response, Lane wrote Ford a letter, dated October 30, 1998, in which Lane advised Ford that he possessed several "sensitive" photographs, including one of the upcoming Ford Thunderbird, which purportedly were provided to Lane by one of Ford's employees. Affidavit of Donald Aiken, Ex. B. The photos allegedly showed pictures of Ford products that were confidential and had not been released to the public. In a letter dated November 3, 1998, Lane threatened to publish materials on his website that Ford would find "disturbing." *Id.,* Ex. C. In both letters, Lane threatened to encourage Ford employees to disclose confidential information. *Id.,* Ex. B & C. Ford met with Lane and requested that Lane obtain Ford's approval prior to posting any Ford documents on the Internet. Lane agreed to do so. Tr. at 20.

Lane later changed his mind. On July 13, 1998, Lane posted an article on his website discussing and quoting from confidential documents that Lane received from an anonymous source relating to quality issues concerning the Ford Mustang Cobra engine. Tr. at 39–41, Defendant's Ex. 2. On July 27, 1999, Lane published information from another document that Lane received from an anonymous source, a document entitled "Powertrain Council Strategy & Focus." This was an internal Ford memo containing Ford's strategies relating to fuel economy, vehicle emissions through the year 2010, and powertrain technology advances. *See* Tr. at 43. Lane also published a Ford engineering blueprint on his site, and stated that he planned to offer other blueprints for sale. Affidavit of Nancy Oatley, Ex. J. In addition, Lane stated that he possessed other confidential Ford documents. When Ford advised Lane that the Company intended to file a lawsuit and to seek an injunction against him, Lane responded by posting approximately forty Ford documents online, including materials with high competitive sensitivity. Ford's Motion for Preliminary Injunction, Ex. A.

Lane testified that he did not know the identity of anyone who provided him with the confidential Ford information that he wrote about and posted verbatim on his website.[2] These anonymous sources, likely former and current Ford employees, gave Ford documents to Lane by delivering

---

2. Lane also received confidential information which was distributed at a meeting of the Ford Team Mustang on June 18, 1999. Lane testified that he was invited to the meeting by a member of the Southeast Michigan Mustang Owner's Association, an organization composed of Mustang vehicle owners that is not affiliated with Ford. Lane wrote on his website that he "crashed" the meeting. In any event, it is undisputed that no one from Ford invited Lane to attend the Team Mustang meeting. Lane published the confidential agenda that he obtained from the Ford Team Mustang meeting. Affidavit of Nancy Oatley, Ex. H.

them to his house or to his truck or by using the U.S. mail. Tr. at 47. Lane was aware of the confidential nature of the Ford documents that he published. Tr. at 17–20 & 57–58; Affidavit of Daniel Stock. Ford representatives informed Lane that Ford employees are bound by a confidentiality agreement.[3] Tr. at 18–19. Lane testified that, with respect to some of the documents, he knew that the Ford employees who gave them to him were breaching their duty to Ford. Tr. at 18. Further, many of the documents were marked "confidential," "property of Ford," "proprietary," or "copyright protected." Tr. at 17; Affidavit of Richard Baker (power train document marked "confidential"). In addition, Lane acknowledged the confidential nature of the Ford documents when he wrote on his website, "Ford must take steps to make sure that from the design state until the time of market—their products undergo the utmost of secrecy. The whole reason behind all of this secrecy? To maintain a competitive advantage." Affidavit of Nancy Oatley, Ex. L.

Because of Lane's publishing activities, on August 25, 1999, Ford Motor Company filed a Complaint and a Motion for a Temporary Restraining Order against him. The Complaint alleges copyright infringement, statutory conversion, intentional interference with contractual relations, misappropriation of trade secrets, misappropriation, trademark infringement, and unfair competition. Ford alleges that Lane posted copyrighted material, and that Lane's use of the Ford logo gives the impression that Ford sponsors or authorizes Lane's website. Ford also alleges that Lane solicited and received trade secrets that were misappropriated; that is, Ford employees gave the trade secrets to Lane in breach of their confidentiality agreements with Ford.

On August 25, 1999, the Court issued a Temporary Restraining Order, which provides as follows:

Robert Lane ... [is] enjoined and ordered as follows:

A. Defendant is restrained from destroying, despoiling or electronically deleting or erasing documents in his possession originated by or for Ford Motor Company.

B. Defendant is ordered to file with the Court, and serve upon Ford Motor Company, within ten (10) days, a sworn statement (1) identifying with particularity all documents within his possession, custody or control which were originated by or for Ford Motor Company, (2) the source (by name or description) of each document, and (3) provide details as to how defendant Robert Lane acquired each document.

C. *Defendant is restrained from (1) using, copying or disclosing any internal document of Ford Motor Company (including the information contained therein)*, (2) committing any acts of infringement of Ford Motor Company's copyrights, including unpublished works

---

**3.** The standard employment agreement signed by Ford employees provides, "I recognize and agree that papers, records and plans generated by me or others for my employer are my employer's property and I am not to make any unauthorized disclosure or retain copies of them." Motion for Temporary Restraining Order, Ex. 2. Ford employees are also bound by Ford Directive C–110 which provides:

> Ford develops and acquires substantial amounts of information and makes that information available to its employees for use in their work. This information, which may be embodied in documents, electronic data or other forms, is a valuable asset and belongs to Ford ....

> Unauthorized disclosure of Ford's information can damage Ford's competitive position and reputation. In no case should an employee make such unauthorized disclosure, use it for their personal benefit, or keep it beyond their term of employment without express permission.

*Id.*, Ex. 1. Ford's Standards of Corporate Conduct manual also states, "Every employee is obligated to maintain the confidentiality of Ford's business information. This obligation survives even after your employment with Ford ends ...." *Id.*, Ex. 3.

known by defendant Robert Lane to have been prepared by a Ford Motor Company employee within the scope of his or her employment, or specially ordered or commissioned by Ford Motor Company, if not an employee, (3) *interfering with Ford's contractual relationship with its employees by soliciting Ford employees to provide Ford trade secrets or other confidential information.*

(emphasis added). The Court deleted from Ford's proposed temporary restraining order language restraining Lane from "using any of Ford Motor Company's trademarks ("Ford," the "Ford Oval" mark, the "Blue Oval" design mark, and the "Blue Oval" word mark) in a manner likely to cause confusion, mistake or deception as to the Ford Motor Company's affiliation, connection, or association with defendant Robert Lane." The Court also ordered the Defendant to show cause why the Temporary Restraining Order should not be entered as a preliminary injunction. Ford subsequently filed a motion seeking such relief.

Lane filed a response to the order to show cause and to Ford's motion for preliminary injunction. In the response, Lane agreed to the entry of the preliminary injunction in the same form as the temporary restraining order, except with respect to section C1, highlighted above.

## II. Standard for Preliminary Injunction

■ The availability of injunctive relief is a procedural question that is governed by federal law. *Southern Milk Sales, Inc. v. Martin,* 924 F.2d 98 (6th Cir.1991). The Sixth Circuit has held that a court generally must consider four factors in deciding whether to issue a TRO or preliminary injunction:

(1) whether the movant has shown a strong or substantial likelihood of success on the merits;

(2) whether the movant has demonstrated irreparable injury;

(3) whether the issuance of a preliminary injunction would cause substantial harm to others; and

(4) whether the public interest is served by the issuance of an injunction.

*Rock and Roll Hall of Fame v. Gentile Productions,* 134 F.3d 749, 753 (6th Cir. 1998); *see also Parker v. United States Dept. of Agriculture,* 879 F.2d 1362, 1367 (6th Cir.1989). In cases involving prior restraint of pure speech, however, the Court is directed to consider whether publication "threaten[s] an interest more fundamental than the First Amendment itself" and to forego the prerequisites from the realm of "everyday resolution of civil disputes governed by the Federal Rules." *Procter & Gamble Co. v. Bankers Trust Co.,* 78 F.3d 219, 227 (6th Cir.1996). Only if a plaintiff can meet this substantially higher standard can a court issue an injunction prohibiting publication of pure speech. *Id.*

## III. Analysis

### A. Misappropriation of Trade Secrets and the Prior Restraint Doctrine

Our legislatures have passed trade secret laws to encourage both business ethics and innovation. Such laws enable businesses to enter into good faith transactions, form stable relationships, and share confidential information, which in turn assists in product development. Also, trade secret laws encourage research and development by supplementing the patent system and supporting innovators who seek to retain the value of their discoveries. Further, trade secret laws punish industrial espionage and deny competitors an advantage they have obtained by unfair means. *See Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470, 481–82, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974).

■ Count IV of Ford's Complaint alleges that Lane violated the Michigan Uniform Trade Secrets Act, Mich. Comp. Laws Ann. § 445.1901–1910 (the "Act"). The Act provides that actual or threatened

misappropriation of trade secrets[4] may be enjoined. *Id.* § 445.1903(1). Section 445.1902(b) of the Act defines "misappropriation" as:

(i) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means, or

(ii) Disclosure or use of a trade secret of another without express or implied consent by a person who did 1 or more of the following:

(A) *Used improper means*[5] *to acquire knowledge of the trade secret.*

(B) *At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was derived from or through a person who had utilized improper means to acquire it, acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or derived from or through a person who owed a duty to the person to maintain its secrecy or limit its use.*

(C) Before a material change of his or her position, knew or had reason to know that it was a trade secret and

that knowledge of it had been acquired by accident or mistake.

*Id.* § 445.1902(b) (emphasis added). Ford alleges that Lane violated section 1902(b)(ii)(A) & (B) because at the time Lane published Ford's trade secrets he used improper means to acquire knowledge of the trade secret, or he knew or had reason to know that his knowledge of the trade secret was derived from or through a person who had utilized improper means to acquire it, acquired it under circumstances giving rise to a duty to maintain its secrecy or limit its use, or it derived from or through a person who owed a duty to the person to maintain its secrecy or limit its use. For example, under the Act Lane misappropriated trade secrets if, when he published the trade secrets, he had reason to know that the employees who provided him with the trade secrets were in breach of their duty to Ford not to disclose the information.

▮ Although Ford has presented evidence to establish that Lane is likely to have violated the Michigan Uniform Trade Secrets Act, the Act's authorization of an injunction violates the prior restraint doctrine and the First Amendment as applied under these circumstances.[6]

---

**4.** The Act defines "trade secret" to mean "information, including a formula, pattern, compilation, program, device, method, technique, or process, that is both of the following: (i) Derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use. (ii) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Mich. Comp. Laws Ann. § 445.1902(d).

**5.** The Act defines "improper means" to include "theft, bribery, misrepresentation, breach, or inducement of a breach of a duty to maintain secrecy or espionage through electronic or other means." MCLA § 445.1902(a).

**6.** The Michigan Uniform Trade Secrets Act is not unconstitutional on its face, as an injunction may issue against one who plans to reveal a trade secret in violation of an employ-

ment contract or in breach of a fiduciary duty. Use of trade secrets in violation of a confidentiality agreement or in breach of a fiduciary duty is not protected by the First Amendment. *Cherne Industrial, Inc. v. Grounds & Assoc., Inc.,* 278 N.W.2d 81, 94 (Minn.1979); *American Motors Corp. v. Huffstutler,* 61 Ohio St.3d 343, 575 N.E.2d 116, 120 (1991). *See Snepp v. United States,* 444 U.S. 507, 100 S.Ct. 763, 62 L.Ed.2d 704 (1980) (where former CIA agent was bound by confidentiality agreement, Court affirmed injunction against agent's publication of non-classified material without prior CIA approval and imposed constructive trust on proceeds derived from publication); *Cohen v. Cowles Media Co.,* 501 U.S. 663, 111 S.Ct. 2513, 115 L.Ed.2d 586 (1991) (First Amendment bar on punishment of speech did not prohibit confidential source from recovering damages for publisher's breach of confidentiality agreement in violation of law regarding promissory estoppel). Note also that the Act permits monetary recovery. Mich. Comp. Laws Ann. § 445.1904.

The First Amendment protects freedom of speech and freedom of the press by providing, "Congress shall make no law ... abridging the freedom of speech, or of the press ...." [7] The First Amendment applies to speech on the Internet. *Reno v. American Civil Liberties Union*, 521 U.S. 844, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997). The primary purpose of the guarantee of freedom of the press is to prevent prior restraints on publication. *Near v. Minnesota*, 283 U.S. 697, 713, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). Even a temporary restraint on pure speech is improper absent the "most compelling circumstances." *In the Matter of Providence Journal Co.*, 820 F.2d 1342, 1351 (1st Cir. 1986).

In the seminal case on prior restraints, *Near v. Minnesota*, the defendant was the publisher of "The Saturday Press," a newspaper containing anti-semitic articles which were critical of local officials. Applying a state statute which authorized an injunction of "malicious, scandalous, and defamatory" publications, the district court issued a permanent injunction against the defendant. The state supreme court affirmed the injunction, and the publisher appealed to the U.S. Supreme Court. The Court reversed, finding that the state statute violated freedom of the press because it was the "essence of censorship." 283 U.S. at 713, 51 S.Ct. 625. The *Near* Court explained that prior restraints may be issued only in rare and extraordinary circumstances, such as when necessary to prevent the publication of troop movements during time of war, to prevent the publication of obscene material, and to prevent the overthrow of the government. *Id.* at 716, 51 S.Ct. 625.

Although the prohibition against prior restraints is by no means absolute, the gagging of publication has been considered acceptable only in "exceptional cases." Even where questions of allegedly urgent national security, or competing constitutional interests, are concerned, we have imposed this "most extraordinary remedy" only where the evil that would result from the reportage is both great and certain and cannot be militated by less intrusive measures.

*CBS v. Davis*, 510 U.S. 1315, 1317, 114 S.Ct. 912, 127 L.Ed.2d 358 (1994).

The broad parameters of the prior restraint doctrine were further explained in the Pentagon Papers case, *New York Times Co. v. United States*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971). There, the federal government sought to enjoin The New York Times and The Washington Post from publishing a classified study on U.S. policy-making in Vietnam. The Vietnam conflict was ongoing, and the government argued that the publication of the classified information might damage the national interest. The Court observed that, because any prior restraint on speech is presumptively invalid under the First Amendment, the government bore a heavy burden of showing a justification for the restraint. Finding that the government had not met its burden, the Court denied the injunction. *Id.* at 714, 91 S.Ct. 2140.[8] The government failed to demonstrate that the injury to the national interest was both great and certain to occur. 403 U.S. at 730, 91 S.Ct. 2140 (Stewart, J., concurring); 403 U.S. at 731, 91 S.Ct. 2140 (White, J., concurring).

The Sixth Circuit has recently applied the prior restraint doctrine to overturn an

---

7. The First Amendment applies to the States via the Fourteenth Amendment. *Near v. Minnesota*, 283 U.S. 697, 707, 51 S.Ct. 625, 75 L.Ed. 1357 (1931).

8. The Supreme Court decided *New York Times* in nine separated opinions, by a six to three majority: Justices Black and Douglas maintained that prior restraints could never be valid; Justices Brennan, White, Stewart, and Marshall maintained that there could be prior restraints in some cases, but not in the one at hand; Justices Burger, Harlan, and Blackmun dissented, arguing that a prior restraint of the publication of classified material was valid.

injunction against the publication of trade secrets and other confidential material in *Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219 (6th Cir.1996). Procter & Gamble and Bankers Trust were parties to civil litigation and had stipulated to the entry of a protective order, which prohibited disclosure of trade secrets and other confidential documents obtained during the discovery process. A journalist from Business Week magazine obtained some of those documents. Procter & Gamble and Bankers Trust sought an injunction prohibiting Business Week from publishing or disclosing any information contained in the documents. The district court held an evidentiary hearing and found that Business Week had knowingly violated the protective order by obtaining the documents. The district court therefore enjoined Business Week from using the confidential materials it had obtained unlawfully.

Business Week appealed. In reversing the district court, the Sixth Circuit held that Business Week's planned publication of the documents did not constitute a grave threat to a critical government interest or to a constitutional right sufficient to justify a prior restraint. To justify a prior restraint on pure speech, "publication must threaten an interest more fundamental than the First Amendment itself." *Id.* at 227.[9] The court found that Procter &

Gamble and Bankers Trusts' commercial interest in the confidential documents was insufficient to justify an injunction. "The private litigants' interest in protecting their vanity or their commercial self-interest simply does not qualify as grounds for imposing a prior restraint." 78 F.3d at 225. Further, the court held that Business Week's allegedly improper conduct in obtaining the documents did not justify imposing a prior restraint,[10] and that the district court was misguided when it inquired into the issue, stating, "[T]he [district] court inquired painstakingly into how Business Week obtained the documents and whether or not its personnel had been aware that they were sealed. While these might be appropriate lines of inquiry for a contempt proceeding or a criminal prosecution, they are not appropriate bases for issuing a prior restraint." *Id.*

Although there are distinctions one can draw between the case brought by Ford and the existing precedent on prior restraint, those distinctions are defeated by the strength of the First Amendment. While it may be true that Ford's trade secrets here are more competitive in nature and more carefully protected than those at issue in *Procter & Gamble*, they are certainly not more volatile than those at issue in the Pentagon Papers case. While it may be true that publication on

---

**9.** Ford has also argued that Lane's publication of Ford documents on his website is "commercial speech," because he stated that he was planning to offer Ford blueprints for sale, he advised Ford that he was going to convert *"blueovalnews.com"* to a fee-paid subscription website, and he had a link which stated "advertise on us." Affidavits of Nancy Oatley and Donald Aiken. The Supreme Court has held that the Constitution accords less protection to commercial speech than to other constitutionally safeguarded forms of expression. *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983). The factors cited by Ford, however, do not convert Lane's website into commercial speech, the core notion of which is "speech which does 'no more than propose a commercial transaction.'" *Id.* at 66, 103 S.Ct. 2875. With reference to the factors cited in *Bolger, Id.* at 66–67, 103 S.Ct.

2875, there was no evidence submitted of advertising ever actually done on the website, no evidence submitted of a specific product offered for sale, and no evidence submitted that Lane's motivation in publishing his website was in fact economic.

**10.** In some circumstances, the Supreme Court has held that the conduct of the publisher is a relevant consideration when considering whether to uphold First Amendment rights. "The right to speak and publish does not carry with it the unrestrained right to gather information." *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 32, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984) (citing *Zemel v. Rusk*, 381 U.S. 1, 16–17, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965)). *See also Cohen v. Cowles Media Co.*, 501 U.S. 663, 111 S.Ct. 2513, 115 L.Ed.2d 586 (1991).

the Internet is subject to fewer editorial restraints than The New York Times, Business Week, or The Washington Post, the material here is not more inflammatory than the anti-semitic tabloid at issue in *Near.* And while the reach and power of the Internet raises serious legal implications, nothing in our jurisprudence suggests that the First Amendment is circumscribed by the size of the publisher or his audience.

The more troubling aspect of this case is whether Lane utilized the power of the Internet to extort concessions or privileges from Ford, by threatening to sell blueprints or other confidential documents. It is apparent from Lane's October 30, 1998 letter that he threatened Ford with the release of sensitive photographs when Ford first blocked his access to Ford's press release website, and that Lane raised the stakes and published more highly confidential documents in response to Ford's announcement of legal action. He also threatened in the October 30 letter to solicit trade secret material from Ford employees, although no evidence was submitted to establish that he actually did so, and Lane has since testified that he does not know the identity of anyone who provided him with documents. Finally, although the documents he published in July, having to do with problems in Mustang engines and with Ford's approach to emission standards, do address issues of public concern, the documents published more recently appear to be design and product information more useful to Ford's competitors—published for the purpose of flexing First Amendment muscle. Although the Sixth Circuit in *Procter & Gamble* has held that a defendant's improper conduct in obtaining confidential information does not justify a prior restraint, the legal system may yet provide redress through criminal prosecution, if such is found to be warranted by the underlying facts.

With respect to this proceeding, however, this Court is bound by existing precedent, and, under the broad holdings of the Pentagon Papers case and *Procter & Gamble,* may not enjoin Lane's publication of Ford's trade secrets and other internal documents. In the absence of a confidentiality agreement or fiduciary duty between the parties, Ford's commercial interest in its trade secrets and Lane's alleged improper conduct in obtaining the trade secrets are not grounds for issuing a prior restraint. *Procter & Gamble,* 78 F.3d at 225. Accordingly, Ford's request for preliminary injunction of Lane's using, copying, or disclosing Ford's internal documents must be DENIED.

## B. Trademark Infringement

■ Ford also seeks a preliminary injunction against Lane's use of its logo and trademark, which were prominently featured on Lane's website. Recent editions of *blueovalnews.com* do not utilize any Ford trademarks or logos, even though Lane was not enjoined from using them by the Temporary Restraining Order. Since Lane appears to have voluntarily desisted from using Ford's trademarks, Ford's motion for a preliminary injunction on this issue is DENIED WITHOUT PREJUDICE as moot.

## IV. Conclusion

The last century has seen substantial advances in communications, of which the Internet is only the most recent development. Each new medium, as it was introduced, changed the balance of power in the constitutional equation involving the First Amendment. Every advance in mass communication has enhanced the immediate and widespread dissemination of information, often resulting in great potential for immediate and irreparable harm. With the Internet, significant leverage is gained by the gadfly, who has no editor looking over his shoulder and no professional ethics to constrain him. Technology blurs the traditional identities of David and Goliath. Notwithstanding such technological changes, however, the Courts have stead-

fastly held that the First Amendment does not permit the prior restraint of speech by way of injunction, even in circumstances where the disclosure threatens vital economic interests.

Being fully advised in the premises, having read the pleadings, taken testimony and heard the arguments of counsel, and for the reasons set forth above, the Court hereby orders as follows:

The August 25, 1999 Temporary Restraining Order is DISSOLVED.

Ford's motion for preliminary injunction is GRANTED IN PART AND DENIED IN PART.

1) Ford's request for preliminary injunction of Lane's using, copying, or disclosing Ford's internal documents is DENIED, and Ford's request for a preliminary injunction against Lane's use of Ford's trademarks and logo is DENIED WITHOUT PREJUDICE as moot.

2) The other aspects of Ford's request for a preliminary injunction are GRANTED since Lane stipulated to the entry of a preliminary injunction as follows:

A. Lane is restrained from destroying, despoiling or electronically deleting or erasing documents in his possession originated by or for Ford Motor Company.

B. Lane is restrained from (1) committing any acts of infringement of Ford's copyrights, including unpublished works known by Lane to have been prepared by a Ford employee within the scope of his or her employment, or specially ordered or commissioned by Ford, if not an employee; and (2) interfering with Ford's contractual relationship with its employees by soliciting Ford employees to provide Ford trade secrets or other confidential information.

3) Lane is still obligated to comply with that part of the August 25, 1999 Temporary Restraining Order which required

him to file with the Court, and serve upon Ford, within ten days, a sworn statement (1) identifying with particularity all documents within his possession, custody or control which were originated by or for Ford, (2) identifying the source (by name or description) of each document, and (3) providing details as to how Lane acquired each document.