Rockingham
No. 2009-262

## The Mortgage Specialists, Inc.

### v.

## Implode-Explode Heavy Industries, Inc.

Argued: November 4, 2009
Opinion Issued: May 6, 2010

228

230

*Devine, Millimet & Branch, P.A.*, of Manchester (*Alexander J. Walker & a.* on the brief, and *Mr. Walker* orally), for the petitioner.

*Orr & Reno, P.A.*, of Concord (*Jeremy D. Eggleton* and *William L. Chapman* on the brief, and *Mr. Eggleton* orally), for the respondent.

*Drummond Woodsum & MacMahon*, of Portsmouth (*Paul L. Apple* on the brief), for Citizen Media Law Project and Reporters Committee for Freedom of the Press, as *amici curiae.*

*Public Citizen Litigation Group*, of Washington, D.C. (*Paul Alan Levy* on the brief), and *Backus, Meyer & Branch, LLP*, of Manchester (*Jon Meyer* on the brief), for Public Citizen, as *amicus curiae.*

CONBOY, J. The respondent, Implode-Explode Heavy Industries, Inc. (Implode), appeals an order of the Superior Court (*McHugh*, J.) granting injunctive relief to the petitioner, Mortgage Specialists, Inc. (Mortgage Specialists). We vacate in part, reverse in part, and remand.

The record supports the following facts. Mortgage Specialists is a mortgage lender. Implode operates a website, www.ml-implode.com, that ranks various businesses in the mortgage industry on a ranking device that it calls "The Mortgage Lender Implode-O-Meter." On its website, Implode identifies allegedly "at risk" companies and classifies them as either "Imploded Lenders" or "Ailing/Watch List Lenders." The website allows visitors who register on the site and create usernames to post publicly viewable comments about lenders.

In August 2008, Implode published an article that detailed administrative actions taken by the New Hampshire Banking Department against Mortgage Specialists. In this article, Implode posted a link to a document that purported to represent Mortgage Specialists' 2007 loan figures (Loan Chart). In response to the article, an anonymous website visitor with the username "Brianbattersby" posted two comments regarding Mortgage Specialists and its president.

After Mortgage Specialists became aware of the article and postings, it petitioned for injunctive relief, alleging that publication of the Loan Chart was unlawful because it violated RSA 383:10-b (2006) (mandating confidentiality of all investigative reports and examinations by the New Hampshire

Banking Department) and that Brianbattersby's postings were false and defamatory. Mortgage Specialists requested that Implode immediately remove the Loan Chart and postings from its website. Mortgage Specialists further demanded that Implode disclose both the identity of Brianbattersby and the source of the Loan Chart.

The trial court granted the requested relief and ordered as follows:

1.  [Implode], and all of its agents, servants, employees, and representatives, are enjoined from displaying, posting, publishing, distributing, linking to and/or otherwise providing any information for the access or other dissemination of copies of and/or images of a 2007 Loan Chart and any information or data contained therein, including on the website operated at *www.ml-implode.com* and any other websites under [Implode's] ownership and control;

2.  [Implode] is ordered to immediately disclose the identity of the individual and/or entity that provided it with the 2007 Loan Chart;

3.  [Implode] is ordered to immediately produce all documents that concern petitioner that it received from the individual or entity that provided it with the 2007 Loan Chart;

4.  [Implode] is ordered not to re-post or re-publish the October 4, 2008, and October 7, 2008, false and defamatory postings by "Brianbattersby," and

5.  [Implode] is ordered to immediately disclose the identity of "Brianbattersby," including his full name, address, email address, phone number, and any other personal information [Implode] possesses.

On appeal, Implode argues that the trial court erred in ordering the disclosure of the sources of the Loan Chart and Brianbattersby's postings, ordering production of all documents concerning Mortgage Specialists received from the Loan Chart source, and enjoining the republication of the Loan Chart and Brianbattersby's postings.

*I. Disclosure of Sources*

Implode first asserts that the trial court erred in ordering it to disclose the identities of the Loan Chart source and Brianbattersby's postings because the First Amendment to the Federal Constitution and Part I,

Article 22 of the New Hampshire Constitution protect a speaker's right to anonymity. The trial court did not analyze Mortgage Specialists' disclosure requests under either constitutional provision. We first address Implode's claims under the State Constitution, and cite federal opinions for guidance only. *State v. Ball*, 124 N.H. 226, 231-33 (1983).

### A. Loan Chart

Implode argues that the newsgathering privilege under Part I, Article 22 of the New Hampshire Constitution protects the identity of the source of the Loan Chart. Mortgage Specialists disputes that Implode is a news organization, and therefore argues that this constitutional protection is unavailable to Implode. It also argues, in the alternative, that its right to disclosure of the Loan Chart source outweighs any potential harm to the free flow of information.

In *Opinion of the Justices*, 117 N.H. 386, 389 (1977), we considered whether a news reporter could be ordered to disclose the sources of information utilized in preparing a series of articles. In holding that the reporter could not be so ordered, we recognized the existence of a reporter's privilege in civil proceedings involving the press as a non-party. *Id.* at 389-90; *see Associated Press v. State of N.H.*, 153 N.H. 120, 128 (2005); *Petition of Keene Sentinel*, 136 N.H. 121, 127 (1992).

> Our constitution quite consciously ties a free press to a free state, for effective self-government cannot succeed unless the people have access to an unimpeded and uncensored flow of reporting. News gathering is an integral part of the process. One study showed that more than ninety percent of the reporters surveyed believed protection of identity was more important than protection of contents.

*Opinion of the Justices*, 117 N.H. at 389. However, we did "not decide the scope of the privilege, whether it was absolute, who is a reporter, what qualifies as 'press,' . . . or whether libel actions would require disclosure." *Id.* In *Keene Publishing Corp. v. Keene District Court*, 117 N.H. 959, 961 (1977), we acknowledged that the right of the press to gather news is "not unlimited."

Although our cases discussing the newsgathering privilege have involved traditional news media, such as newspapers, *see, e.g., Keene Pub. Corp.*, 117 N.H. at 960, we reject Mortgage Specialists' contention that the newsgathering privilege is inapplicable here because Implode is neither an established media entity nor engaged in investigative reporting. The trial court implicitly found that Implode is a "legitimate publisher of informa-

tion" and a member of the press. The court further noted that it "has every reason to believe that [Implode] is a reputable entity desirous of only publishing legitimate information about the mortgage industry to various interested parties." Moreover, we observe that:

> Freedom of the press is a fundamental personal right which is not confined to newspapers and periodicals. . . . The press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion. The informative function asserted by representatives of the organized press . . . is also performed by lecturers, political pollsters, novelists, academic researchers, and dramatists. Almost any author may quite accurately assert that he is contributing to the flow of information to the public, that he relies on confidential sources of information, and that these sources will be silenced if he is forced to make disclosures.

*Branzburg v. Hayes*, 408 U.S. 665, 704 (1972) (quotations and citations omitted). The fact that Implode operates a website makes it no less a member of the press. In light of the trial court's implicit findings, we conclude that Implode's website serves an informative function and contributes to the flow of information to the public. Thus, Implode is a reporter for purposes of the newsgathering privilege.

We also reject Mortgage Specialists' alternative argument that if Implode is considered a reporter, then *Downing v. Monitor Publishing Co., Inc.*, 120 N.H. 383 (1980), is controlling and disclosure is warranted. In *Downing*, the issue was whether the defendant-newspaper in a libel case should be required to disclose the source of allegedly defamatory information it published. *Id.* at 384. In holding that it should, we also held that "there is no absolute privilege allowing the press to decline to reveal sources of information when those sources are essential to a libel plaintiff's case." *Id.* at 386. We established that a "plaintiff must satisfy the trial court that he has evidence to establish that there is a genuine issue of fact regarding the falsity of the publication." *Id.* at 385-87. Critical to our ultimate ruling that source disclosure was required was the fact that as a public official, the plaintiff was required to prove that the defendant-newspaper acted with actual malice. *Id.* at 385. Here, Mortgage Specialists does not seek damages against Implode for libel. As the trial court found,

> [Mortgage Specialists] does not "blame" [Implode] for the publishing of the unauthorized and allegedly defamatory website postings, and it asks for no sanctions or money damages as against the respondent. [Mortgage Specialists] does not claim that

[Implode] had some duty or responsibility to verify the information with respect to either the story or the Brianbattersby comments prior to posting them on its website. [Mortgage Specialists] does not allege that [Implode] knew or should have known that the publication of the 2007 Loan Chart was prohibited under New Hampshire Law.

Accordingly, *Downing* does not require source disclosure in this case.

■ We have set forth guidelines to determine whether a plaintiff can compel a defendant-newspaper to disclose confidential sources in a libel action, *see id.* at 384-87, and whether a defendant can overcome the qualified newsgathering privilege in a criminal case, *see State v. Siel*, 122 N.H. 254, 259 (1982) (a defendant may overcome the newsgathering privilege and compel disclosure of confidential sources "only when he shows: (1) that he has attempted unsuccessfully to obtain the information by all reasonable alternatives; (2) that the information would not be irrelevant to his defense; and (3) that by a balance of the probabilities, there is a reasonable possibility that the information sought as evidence would affect the verdict in his case"). However, we have not yet established a standard to determine whether a plaintiff can overcome the newsgathering privilege in a civil suit where the press is a non-party to a defamation action. In the absence of binding precedent, in interpreting Part I, Article 22 of our State Constitution, we are guided by the First Circuit Court of Appeals' balancing test, which weighs the First Amendment rights of a news organization against the rights of a litigant seeking confidential information. *See Bruno & Stillman, Inc. v. Globe Newspaper Co.*, 633 F.2d 583, 595-98 (1st Cir. 1980).

■■ In *Bruno & Stillman*, the First Circuit vacated the district court's decision granting the boat company-plaintiff's motion to compel the disclosure of confidential sources and information conveyed by them to *The Boston Globe. Id.* at 584, 599, 593. The plaintiff requested such disclosure to ascertain the parties for a defamation claim. *Id.* at 584. The newspaper-defendant asserted a conditional privilege

> to refuse to disclose a reporter's confidential source until the party seeking disclosure establishes generally that the public interest in disclosure is compelling enough to override the disruption or threat to the continued free flow of information to the media by showing specifically that (1) the information sought is critical to plaintiff's claim and (2) the information is not available from other sources.

*Id.* at 594. The First Circuit agreed and instructed courts faced with requests for the discovery of journalistic materials to "be aware of the possibility that the unlimited or unthinking allowance of such requests will impinge upon First Amendment rights." *Id.* at 595. It remanded the case for reconsideration of the plaintiff's motion to compel discovery and instructed the district court to "balance the potential harm to the free flow of information that might result against the asserted need for the requested information." *Id.* at 596. The court cited several factors for trial courts to consider, including whether the claim is merely "a pretense for using discovery powers in a fishing expedition," whether there is a need for confidentiality between the journalist and the source, the exhaustion of other non-confidential sources, and the importance of confidentiality to preserve the journalist's continued newsgathering effectiveness. *Id.* at 597-98. In elaborating upon its balancing test, the First Circuit further explained that:

> Each party comes to this test holding a burden. Initially, the movant must make a prima facie showing that his claim of need and relevance is not frivolous. Upon such a showing, the burden shifts to the objector to demonstrate the basis for withholding the information. The court then must place those factors that relate to the movant's need for the information on one pan of the scales and those that reflect the objector's interest in confidentiality and the potential injury to the free flow of information that disclosure portends on the opposite pan.

*In re Cusumano,* 162 F.3d 708, 716 (1st Cir. 1998) (citations omitted). Although the *Bruno & Stillman* court ordered the district court to apply this balancing test, it "deliberately refrain[ed] from further categorizing with any precision what inquiries should be made by the court or in what sequence" because the inquiry is "one that demands sensitivity, invites flexibility, and defies formula." *Bruno & Stillman,* 633 F.2d at 598. "While obviously the discretion of the trial judge has wide scope, it is a discretion informed by an awareness of First Amendment values and the precedential effect which decision in any one case would be likely to have." *Id.* The court also noted that "[g]iven the sensitivity of inquiry in this delicate area, detailed findings of fact and explanation of the decision would be appropriate." *Id.*

We hold that this balancing test applies to a trial court's review of a petition seeking disclosure of an anonymous source from the press to ascertain the identity of a potential defendant in a defamation action. Here, the trial court ordered the disclosure of the Loan Chart source without analyzing the applicability of the qualified newsgathering privilege or

conducting any balancing of interests. We therefore vacate the trial court's disclosure order and remand for further proceedings consistent with this opinion.

### B. Brianbattersby's Postings

Implode also challenges the trial court's order mandating disclosure of the source of the Brianbattersby's postings. Implode argues that the trial court erred in failing to balance Brianbattersy's First Amendment rights against Mortgage Specialists' need to discover his identity. In ordering disclosure of Brianbattersby's identity, the court found that "[t]he maintenance of a free press does not give a publisher a right to protect the identity of someone who has provided it with unauthorized or defamatory information."

■ "[A]n author's decision to remain anonymous, like other decisions concerning omissions or additions to the content of a publication, is an aspect of the freedom of speech protected by the First Amendment." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 342 (1995); *see Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182, 199-200 (1999). This protection extends to anonymous internet speech. *See Reno v. American Civil Liberties Union*, 521 U.S. 844, 870 (1997). However, "the anonymity of speech . . . is not absolute and may be limited by defamation considerations." *Independent News v. Brodie*, 966 A.2d 432, 441 (Md. 2009) (citing *Beauharnais v. Illinois*, 343 U.S. 250, 266 (1952) ("Libelous utterances [are] not . . . within the area of constitutionally protected speech . . . .")); *see Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942).

We take this opportunity to adopt a standard for trial courts to apply when a plaintiff requests disclosure of the identity of an anonymous defendant who has posted allegedly defamatory material on the Internet.

> In so doing, we recognize the complexity of the decision to order disclosure regarding pseudonyms or usernames in the context of the First Amendment and a defamation allegation. On the one hand, posters have a First Amendment right to retain their anonymity and not to be subject to frivolous suits for defamation brought solely to unmask their identity. On the other, viable causes of actions for defamation should not be barred in the Internet context.

*Brodie*, 966 A.2d at 449 (citations omitted); *see Doe v. Cahill*, 884 A.2d 451, 457 (Del. 2005) (The " 'sue first, ask questions later' approach, coupled with a standard only minimally protective of the anonymity of defendants, will discourage debate on important issues of public concern as more and more

anonymous posters censor their online statements in response to the likelihood of being unmasked."); *Best Western Intern., Inc. v. Doe*, No. CV-06-1537-PHX-DGC, 2006 WL 2091695, at *1 (D. Ariz. July 25, 2006) ("Those who suffer damages as a result of tortious or other actionable communications on the Internet should be able to seek appropriate redress by preventing the wrongdoers from hiding behind an illusory shield of purported First Amendment rights." (quotations omitted)).

Recently, several courts have enunciated rules regarding disclosure of anonymous Internet speakers. *See Brodie*, 966 A.2d at 447-57; *Cahill*, 884 A.2d at 457-61. The seminal case is *Dendrite International, Inc. v. Doe Number 3*, 775 A.2d 756 (N.J. Super. Ct. App. Div. 2001). The plaintiff corporation, Dendrite, sued several John Doe defendants for defamation, based, in part, on the posting of statements on a website forum. *Dendrite*, 775 A.2d at 763. Dendrite appealed an order denying its request to conduct limited expedited discovery to ascertain the identity of the John Doe defendants. *Id.* at 760. A three-judge panel of the Superior Court of New Jersey affirmed the denial of Dendrite's motion based upon the trial court's finding that Dendrite failed to establish harm resulting from the Internet comments. *Id.* The court set forth the following analytical framework to be applied by trial courts in assessing applications to compel disclosure of the identities of anonymous Internet posters by Internet service providers:

> The trial court must consider and decide those applications by striking a balance between the well-established First Amendment right to speak anonymously, and the right of the plaintiff to protect its proprietary interests and reputation through the assertion of recognizable claims based on the actionable conduct of the anonymous, fictitiously-named defendants.

> We hold that when such an application is made, the trial court should first require the plaintiff to undertake efforts to notify the anonymous posters that they are the subject of a subpoena or application for an order of disclosure, and withhold action to afford the fictitiously-named defendants a reasonable opportunity to file and serve opposition to the application. These notification efforts should include posting a message of notification of the identity discovery request to the anonymous user on the [Internet service provider's] pertinent message board.

> The court shall also require the plaintiff to identify and set forth the exact statements purportedly made by each anonymous poster that plaintiff alleges constitutes actionable speech.

The complaint and all information provided to the court should be carefully reviewed to determine whether plaintiff has set forth a prima facie cause of action against the fictitiously-named anonymous defendants. In addition to establishing that its action can withstand a motion to dismiss for failure to state a claim upon which relief can be granted . . . the plaintiff must produce sufficient evidence supporting each element of its cause of action, on a prima facie basis, prior to a court ordering the disclosure of the identity of the unnamed defendant.

Finally, assuming the court concludes that the plaintiff has presented a prima facie cause of action, the court must balance the defendant's First Amendment right of anonymous free speech against the strength of the prima facie case presented and the necessity for the disclosure of the anonymous defendant's identity to allow the plaintiff to properly proceed.

The application of these procedures and standards must be undertaken and analyzed on a case-by-case basis. The guiding principle is a result based on a meaningful analysis and a proper balancing of the equities and rights at issue.

*Id.* at 760-61.

We conclude that the *Dendrite* test is the appropriate standard by which to strike the balance between a defamation plaintiff's right to protect its reputation and a defendant's right to exercise free speech anonymously. Accordingly, we join those courts which endorse the *Dendrite* test. *See Brodie*, 966 A.2d at 457; *Mobilisa, Inc. v. Doe*, 170 P.3d 712, 719-21 (Ariz. Ct. App. Div. 2007); *Krinsky v. Doe 6*, 72 Cal. Rptr. 3d 231, 241-48 (Ct. App. 2008); *Best Western*, 2006 WL 2091695, at *4. We hold that the qualified privilege to speak anonymously requires the trial court to "balanc[e] . . . the equities and rights at issue," thus ensuring that a plaintiff alleging defamation has a valid reason for piercing the speaker's anonymity. *Dendrite*, 775 A.2d at 761. We accordingly vacate the trial court's disclosure order and remand for further proceedings consistent with the *Dendrite* test.

## II. Production of Other Documents from the Loan Chart Source

Implode also argues that the trial court erred in ordering it to produce all documents concerning Mortgage Specialists that it received from the Loan Chart source. Implode contends that the newsgathering privilege protects it from producing documents and information acquired

through the newsgathering process. Because the trial court did not analyze this issue in light of the newsgathering privilege, we vacate the trial court's production order and remand for further proceedings consistent with this opinion.

*III. Republication of the Loan Chart and Brianbattersby's Postings*

Finally, Implode argues that the trial court erred in enjoining it from republishing the Loan Chart and the two Brianbattersby postings because the injunction constitutes an unlawful "prior restraint" on publication in violation of the First Amendment to the Federal Constitution. Mortgage Specialists counters that the publication of the Loan Chart is unlawful because it violates the confidentiality requirements of RSA 383:10-b (2006) and constitutes an invasion of privacy. It further asserts that the Brianbattersby postings are unlawful because they are false and defamatory.

Generally, "[w]e will uphold the issuance of an injunction absent an error of law, an unsustainable exercise of discretion, or clearly erroneous findings of fact." *N.H. Dep't of Envtl. Servs. v. Mottolo*, 155 N.H. 57, 63 (2007). In cases involving alleged prior restraint of speech, the trial court must consider whether publication "threaten[s] an interest more funda-mental than the First Amendment itself." *Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 227 (6th Cir. 1996). "Only if a plaintiff can meet this substantially higher standard can a court issue an injunction prohibiting publication of pure speech." *Ford Motor Co. v. Lane*, 67 F. Supp. 2d 745, 749 (E.D. Mich. 1999); *see McDermott v. Ampersand Publishing, LLC*, 593 F.3d 950, 957 (9th Cir. 2010) ("[A] higher bar than usual is set for those seeking injunctive relief . . . where there is at least some risk that constitutionally protected speech will be enjoined." (quotation omitted)). In considering the validity of such injunctions under the First Amendment, we have "an obligation to 'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.'" *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 499 (1984) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 284-86 (1964)).

Courts and commentators define prior restraint as a judicial order or administrative system that restricts speech, rather than merely punish-ing it after the fact. *See* Meyerson, *Rewriting Near v. Minnesota: Creating a Complete Definition of Prior Restraint*, 52 MERCER L. REV. 1087, 1087, 1096 (2001). In reviewing prior restraint cases, the United States Supreme Court has stated: "The court has interpreted . . . [First Amendment] guarantees to afford special protection against orders that prohibit the

publication or broadcast of particular information or commentary — orders that impose a 'previous' or 'prior' restraint on speech." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 556 (1976). "Temporary restraining orders and permanent injunctions — i.e., court orders that actually forbid speech activities — are classic examples of prior restraints." *Alexander v. United States*, 509 U.S. 544, 550 (1993). "[P]rior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights." *Stuart*, 427 U.S. at 559.

In the seminal prior restraint case, *Near v. Minnesota*, 283 U.S. 697 (1931), the defendant was the publisher of a newspaper containing anti-Semitic articles critical of local officials. In issuing a permanent injunction against the defendant, the trial court relied upon a state statute authorizing injunction of "malicious, scandalous and defamatory" publications. *Id.* at 701-02, 706. The state supreme court affirmed, and the publisher appealed to the United States Supreme Court. *Id.* at 706-07. The Court reversed, finding that the state statute violated the freedom of the press because it was the "essence of censorship." *Id.* at 713. The Court explained that prior restraints may be issued only in rare and extraordinary circumstances, such as when necessary to prevent the publication of troop movements during time of war, to prevent the publication of obscene material, and to prevent the overthrow of the government. *Id.* at 716.

In the Pentagon Papers case, *New York Times Co. v. United States*, 403 U.S. 713, 714 (1971), the federal government sought to enjoin *The New York Times* and *The Washington Post* from publishing a stolen classified study on United States decision-making policy in Vietnam. Although the newspapers sought to publish these top-secret documents during the Vietnam War and the documents contained highly classified information that presumably threatened national security, the Supreme Court held that even those threats to important governmental interests could not overcome the established presumption against prior restraint on speech. *Id.*

It is a "hallowed First Amendment principle that the press shall not be subjected to prior restraints." *Matter of Providence Journal Co.*, 820 F.2d 1342, 1344 (1st Cir. 1986). "Of all the constitutional imperatives protecting a free press under the First Amendment, the most significant is the restriction against prior restraint upon publication." *Id.* at 1345. When a prior restraint takes the form of a court-issued injunction, the risk of infringing speech protected under the First Amendment increases. *Cf. Madsen v. Women's Health Center, Inc.*, 512 U.S. 753, 764 (1994) ("Injunctions . . . carry greater risks of censorship and discriminatory application than do general ordinances."). The danger of a prior restraint is that it "has an immediate and irreversible sanction" which "freezes" speech "at least

for the time." *Stuart*, 427 U.S. at 559; *see Matter of Providence Journal Co.*, 820 F.2d at 1345-46. For these reasons, "[a]ny prior restraint on expression comes . . . with a heavy presumption against its constitutional validity." *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971) (quotation omitted).

"When . . . the prior restraint impinges upon the right of the press to communicate news and involves expression in the form of pure speech — speech not connected with any conduct — the presumption of unconstitutionality is virtually insurmountable." *Matter of Providence Journal Co.*, 820 F.2d at 1348. "As the Supreme Court made clear in *Stuart*, a party seeking a prior restraint against the press must show not only that publication will result in damage to a near sacred right, but also that the prior restraint will be effective and that no less extreme measures are available." *Id.* at 1351 (noting that "[t]he trial court failed to make a finding as to either of these issues, an omission making the invalidity of the order even more transparent"). "Even where questions of allegedly urgent national security, or competing constitutional interests, are concerned, [the Supreme Court has] imposed this 'most extraordinary remedy' only where the evil that would result from the reportage is both great and certain and cannot be mitigated by less intrusive measures." *CBS Inc. v. Davis*, 510 U.S. 1315, 1317 (1994) (Blackmun, J., in chambers) (quotations, citations, and brackets omitted).

Although the injunction here prohibits republication of the Loan Chart and postings, rather than their publication in the first instance, the injunction is nevertheless a restriction on what Implode may publish in the future. Accordingly, we conclude that the injunction effectively functions as a prior restraint that "freezes" speech at least for a time.

We reject Mortgage Specialists' argument that such restraint is justified because publication of the Loan Chart violates the confidentiality requirements of RSA 383:10-b and constitutes an "unlawful" invasion of privacy. Here, the trial court made no finding that Implode unlawfully obtained the Loan Chart and Mortgage Specialists makes no such assertion. The Supreme Court has held that the lawfulness of publishing information does not depend upon the nature of the information itself, but, rather, upon whether the information was obtained lawfully by the publisher. *See Smith v. Daily Mail Publishing Co.*, 443 U.S. 97, 101-06 (1979). Thus, the Court has invalidated prior restraints on publication of information lawfully obtained by the publisher, even when the information was confidential or initially obtained unlawfully by a third party. *See, e.g., The Florida Star v. B.J.F.*, 491 U.S. 524, 535 (1989) (acknowledging "the

'timidity and self-censorship' which may result from allowing the media to be punished for publishing certain truthful information"); *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 496-97 (1975); *New York Times Co.*, 403 U.S. at 714 (refusing to suppress publication of papers stolen from the Pentagon by a third party).

In *Bartnicki v. Vopper*, 532 U.S. 514, 535 (2001), the Court held that a radio broadcaster who lawfully obtained a taped recording of a telephone conversation from an unknown third party, who had made the recording in violation of federal and state laws, could not be held liable for intentional disclosure of illegally intercepted communications. The Court considered the question, "Where the . . . publisher of information has obtained the information in question in a manner lawful in itself but from a source who has obtained it unlawfully, may the government punish the ensuing publication of that information based on the defect in a chain?" *Id.* at 528. Relying upon its decision in the Pentagon Papers case, the Court concluded "that a stranger's illegal conduct does not suffice to remove the First Amendment shield from speech about a matter of public concern." *Id.* at 535. The Court held that because the publisher had played no part in the illegal interception, the petitioner's privacy rights were outweighed by the respondent's interest in publishing matters of public importance. *Id.* at 534-35.

■ Even when confidential information has allegedly been obtained unlawfully by the publisher, courts have invalidated prior restraints on publication. "[T]he prior restraint doctrine [is not] inapplicable because the [information to be published] was obtained through the 'calculated misdeeds' of [the publisher.]" *Davis*, 510 U.S. at 1318. In *Procter & Gamble*, the Sixth Circuit Court of Appeals reversed a district court's permanent injunction prohibiting a magazine from disclosing information contained in documents filed under seal by parties to a commercial litigation. *Procter & Gamble Co.*, 78 F.3d at 225. The court determined that the magazine obtained the documents in violation of a protective order, through a leak from the parties. *Id.* at 223. In reversing, the Sixth Circuit held that the planned publication of the information did not constitute a grave threat to a critical governmental interest or to a constitutional right sufficient to justify a prior restraint. *Id.* at 227. The court also found that the trial court's inquiry into how the magazine obtained the documents was misguided. *Id.* at 225. The court explained that "[w]hile these might be appropriate lines of inquiry for a contempt proceeding or a criminal prosecution, they are not appropriate bases for issuing a prior restraint." *Id.*

Similarly, in *Lane*, the district court denied Ford Motor Company's motion to enjoin an Internet website from posting allegedly misappropriated trade secrets. *Lane*, 67 F. Supp. 2d at 746. The respondent website had obtained "closely guard[ed] strategic, marketing, and product development plans" from anonymous internal sources at Ford. *Id.* at 746. The court held that Ford's commercial interests in its trade secrets and the website's allegedly unlawful conduct in obtaining the documents could not justify a prior restraint. *Id.* at 752-53. "Courts have steadfastly held that the First Amendment does not permit the prior restraint of speech by way of injunction, even in circumstances where the disclosure threatens vital economic interests." *Id.* at 753-54.

While it may be true that Mortgage Specialists' loan information is "confidential," such information is certainly not more sensitive than the documents at issue in the Pentagon Papers case. Nor are the Loan Chart and postings more inflammatory than the anti-Semitic publications at issue in *Near*. Accordingly, we conclude that Mortgage Specialists' interests in protecting its privacy and reputation do not justify the extraordinary remedy of prior restraint. As the Supreme Court has recognized, "No prior decisions support the claim that the interest of an individual in being free from public criticism of his business practices . . . warrants use of the injunctive power of a court. Designating the conduct as an invasion of privacy . . . is not sufficient to support [a prior restraint]." *Keefe*, 402 U.S. at 419-20; *see Davis*, 510 U.S. at 1318 ("Subsequent civil or criminal proceedings, rather than prior restraints, ordinarily are the appropriate sanction for calculated defamation or other misdeeds in the First Amendment context."); *Procter & Gamble Co.*, 78 F.3d at 225 ("The private litigants' interest in protecting their vanity or their commercial self-interest simply does not qualify as grounds for imposing a prior restraint."); *Matter of Providence Journal Co.*, 820 F.2d at 1345 ("If a publisher is to print a libelous, defamatory, or injurious story, an appropriate remedy, though not always totally effective, lies not in an injunction against that publication but in a damages or criminal action *after* publication."). We therefore reverse the trial court's order prohibiting republication of the Loan Chart and Brianbattersby postings.

*Vacated in part; reversed in part; and remanded*

BRODERICK, C.J., and DALIANIS, DUGGAN and HICKS, JJ., concurred.