**FIVE FOR ENTERTAINMENT
S.A., et al., Plaintiffs,**

v.

**Ramon Luis Ayala RODRIGUEZ,
et al., Defendants.**

**No. 11–24142–CIV.**

United States District Court,
S.D. Florida.

July 9, 2012.

Daniel Eric Vielleville, Peter Emerson Berlowe, Assouline & Berlowe, Miami, FL, Eric W. Bloom, Tomas Leonard, Winston & Strawn, Washington, DC, Margaret Ciavarella, Winston & Strawn, New York, NY, for Plaintiffs.

Edwin Prado, Prado Nunez & Associates, San Juan, PR, Joshua B. Spector, Perlman, Bajandas, Yevoli & Albright, P.L., Miami, FL, Paul Dewey Turner, Perlman, Bajandas, Yevoli & Albright, P.L., Fort Lauderdale, FL, for Defendants.

## ORDER GRANTING IN PART MOTION TO DISMISS, DENYING AS MOOT MOTION FOR BOND AND DENYING MOTION FOR HEARING

PATRICIA A. SEITZ, District Judge.

This case involves a failed series of concerts in Argentina involving Daddy Yankee, a multiple Grammy award-winning singer of Reggaeton music. Plaintiffs entered into two contracts to promote and produce ten Daddy Yankee concerts scheduled for November of 2010. After Plaintiffs expended more than $1,000,000 in support of the tour, and just days before the first concert, Defendants issued a press release canceling the entire tour. The press release, which Defendants posted on their own websites, indicated that Plaintiffs had failed to pay monies owed to Daddy Yankee and blamed Plaintiffs for the canceled tour. Plaintiffs have filed suit against Defendants for breach of contract, defamation and various other claims.

Currently before the Court are Defendants' Motion to Dismiss counts 2 and 5–9 [DE–18], a request for bond on Plaintiffs' FDUTPA claim [DE–19] and a request for a hearing [DE–20]. The Court has considered the motions, Plaintiffs' responses [DE–21, 22] and the replies [DE–23, 24]. For the reasons set forth below, the Court will grant in part the motion to dismiss and deny the motions for bond and for a hearing. Specifically, the Court will dismiss Counts 5–9 without prejudice, grant the motion to dismiss the request for lost profits in Count 8 with prejudice and deny the motion as to Count 2.

### I. BACKGROUND FACTS

The facts, taken from the Complaint, are as follows: Plaintiffs Five for Entertainment S.A., d/b/a/ Five Live Entertainment ("Five Live") and its president and majority shareholder, Diego Hernan De Iraola ("De Iraola"), are in the business of pro-

ducing and promoting concerts for musical artists in Argentina. On June 8, 2010, Five Live and Defendant El Cartel Records, Inc. ("El Cartel") entered into an "Artist Engagement Contract" for a series of six performances by Defendant Ramon Luis Ayala Rodriguez a/k/a/ Daddy Yankee in Argentina. Under the terms of that contract, Five Live agreed to pay a total of $820,000 to Defendant Icaro Services, Inc. ("Icaro"), Daddy Yankee's booking agent, payable in four $205,000 payments. Although the contract specified dates for those payments, Plaintiffs allege that all parties understood the payments would actually be made on a rolling basis. Between June and November 2010, De Iraola made thirteen payments to Icaro's president Edgar Baldiri Martinez ("Baldiri") totaling $796,895.

Per the terms of the contract, Five Live paid all costs associated with the concerts, including the cost of equipment, lighting, audio and technical support. Five Live also arranged for and paid all transportation, food and lodging for Daddy Yankee and thirty members of his staff. Five Live also made down payments in excess of $150,000 for airfare and lodging alone in anticipation of the concerts.

Daddy Yankee arrived in Argentina in September 2010 for a promotional tour in advance of the concerts. During this promotional tour, and allegedly at the behest of Baldiri, Daddy Yankee made public statements announcing four additional concerts, describing the tour as ten shows, not six as specified in the contract. After the producers of the additional shows backed out, Baldiri advised De Iraola that the Defendants expected Five Live to produce the additional four shows. Further, Baldiri threatened to cancel the six-show tour unless De Iraola agreed to produce the entire ten-show tour. De Iraola agreed to the demands and immediately took steps to promote the additional shows. De Irao-

la traveled extensively to different venues, negotiated contracts with local vendors and producers and commenced integration of the existing marketing and logistic efforts already underway with those necessary for the additional shows.

De Iraola performed all of this work without a contract for the additional shows and without an agreement for the amount or timing of Daddy Yankee's fee for the additional four shows. On October 24, 2010, De Iraola traveled to Columbia to meet with Baldiri and discuss payment for the four additional shows, but they were unable to reach an agreement. On October 27, 2010, Argentina's former President Nestor Kirchner, spouse of then President Cristina F. de Kirchner, passed away unexpectedly. As a result, weekend games for the national soccer team were suspended, requiring the games to be rescheduled at venues and on dates scheduled for Daddy Yankee's tour. The parties thereafter rescheduled the tour, with the first concert set to start on November 19, 2010.

On November 1, 2010, Baldiri emailed De Iraola a draft contract for the additional shows. Under its terms, De Iraola would pay Daddy Yankee $480,000 for the additional shows. The contract price was payable in four installments on specified dates set forth in the contract, three of which had already passed by the time Baldiri emailed the contract to De Iraola. De Iraola immediately signed and emailed the contract back to Baldiri. No Defendant, however, signed the agreement. On November 10, 2010, the parties agreed that the fee would be paid upon Daddy Yankee's arrival in Argentina.

Without specifying the time frame involved, Plaintiffs allege that Baldiri demanded payment in full of the $480,000. De Iraola offered to wire the money to Icaro's account once Daddy Yankee and his staff arrived in Argentina. De Iraola

maintains it was necessary to condition payment on Daddy Yankee's arrival in Argentina because of Baldiri's repeated threats to cancel the tour. On November 16, 2010, Mireddys Gonzalez, Daddy Yankee's manager, sent an email to De Iraola indicating that she would cancel the tour if De Iraola failed to promptly pay the entire fee for all ten shows. De Iraola offered to begin the wire transfer before Daddy Yankee left the United States if an Icaro employee traveled to Buenos Aires to supervise the transfer of funds. Gonzalez and Baldiri refused that offer.

On November 17, 2010, Icaro issued an official communication to the media announcing the cancellation of all ten of Daddy Yankee's shows. On that same date, Daddy Yankee posted a press release on his personal website and Icaro's website, both of which are available to the public. Plaintiffs allege that the press release contains the following false statements:

(i) Plaintiff De Iraola, producer and party responsible for the concerts in Argentina, was in arrears and owed more than 40% of Daddy Yankee's fee for the shows; (ii) Defendants had afforded Plaintiff De Iraola every opportunity to pay and offered him different alternative means of complying with his contractual obligations; (iii) Defendants' goodwill and efforts had been in vain because on the day prior to the scheduled trip to Argentina, Plaintiffs were still in default, and (iv) Plaintiff Five Live, under the direction of Plaintiff De Iraola, had failed to adequately perform its contractual obligations under the governing contract.

Compl., ¶ 71. Plaintiffs further allege that the statements in the press release were made with the knowledge, consent and approval of Baldiri, Icaro, El Cartel and Daddy Yankee. The contents of the press release were thereafter picked up by more than 130 media outlets, including internet, television and radio.

In the weeks following the press release, Baldiri continued to make false statements against Plaintiffs. In a November 26, 2010 article, Baldiri accused De Iraola of forging Baldiri's signature on certain contracts with local vendors. Another article indicates that Baldiri also stated that De Iraola entered into agreements on behalf of Five Live even though De Iraola was not affiliated with Five Live. As a result of the cancellation of the shows and the "smear" campaign perpetrated by the Defendants, Plaintiffs allege they are no longer a viable business and De Iraola has suffered debilitating anxiety and numerous physical maladies. He has been admitted to the emergency room several times and remains under the care of a psychiatrist.

Plaintiffs' nine count Complaint contains contractual claims, equitable claims, tort claims, statutory claims and a conspiracy claim all arising from the failed concert series and subsequent public statements made by Defendants. The two contract claims Five Live asserts against Daddy Yankee and El Cartel are Count One (Breach of Contract) and Count Two (Breach of Contract—Second Contract). The two equitable claims are pled in the alternative to the contractual claims and also involve Five Live against Daddy Yankee and El Cartel, namely Count Three (Unjust Enrichment) and Count Four (Quantum Meruit). The three tort claims include: Count Five (Defamation [Plaintiffs Five Live and De Iraola against Defendants Daddy Yankee, El Cartel, Icaro and Baldiri]); Count Six (Injurious Falsehood [Plaintiffs Five Live and De Iraola against Defendants Daddy Yankee, El Cartel, Icaro and Baldiri]); and Count Seven (Intentional Infliction of Emotional Distress [Plaintiff De Iraola against Defendants El Cartel, Icaro and Baldiri]).

Count Eight is filed on behalf of both Plaintiffs against all Defendants and asserts a violation of Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"). Finally, Count Nine alleges a civil conspiracy to defame against all Defendants. Defendants have moved to dismiss Counts 2 and 5–9 for failure to state a claim and lack of subject matter jurisdiction. [DE–18].

## II. LEGAL STANDARD

The purpose of a motion to dismiss filed pursuant to Rule 12(b)(6) is to test the facial sufficiency of a complaint. Although a complaint challenged by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff is still obligated to provide the "grounds" for his entitlement to relief, and a "formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Once a court "identifies pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," it must determine whether the well-pled facts "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). A complaint can only survive a 12(b)(6) motion to dismiss if it contains factual allegations that are "enough to raise a right to relief above the speculative level, on the assumption that all the [factual] allegations in the complaint are true." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955. However, a well-pled complaint survives a motion to dismiss "even if it strikes a savvy judge that actual proof of these facts is improba-

ble, and 'that a recovery is very remote and unlikely.'" *Id.* at 556, 127 S.Ct. 1955.

## III. LEGAL ANALYSIS

### A. FLORIDA'S SINGLE ACTION RULE—NOTICE UNDER FLA. STAT. § 770.01

Defendants first argue that the Court lacks subject matter jurisdiction over counts 5–9 because Plaintiffs failed to comply with the pre-suit notice requirement set forth in Florida Statute § 770.01. That statute provides:

> Before any civil action is brought for publication or broadcast, in a newspaper, periodical, or other medium, of a libel or slander, the plaintiff shall, at least 5 days before instituting such action, serve notice in writing on the defendant, specifying the article or broadcast and the statements therein which he or she alleges to be false and defamatory.

Fla. Stat. § 770.01. Although only Count Five is a defamation claim, Defendants maintain that the Court must characterize Counts 5–9 as a "set of intertwined claims that all stem from the same defamation claim." [1] Defs.' Mot., p. 4. Based on such a characterization of Counts 5–9, Defendants argue that all five claims must be dismissed for failure to comply with § 770.0's five-day notice requirement.

Relying on *Alvi Armani Medical, Inc. v. Hennessey*, Defendants argue that the publication of the statements on Defendants' web pages falls within the "other medium" language of § 770.01. 629 F.Supp.2d 1302 (S.D.Fla.2008). In response, Plaintiffs argue that § 770.0's notice requirement does not apply to these Defendants because they are "non-media

---

**1.** Defendants rely on the single action rule, *Fridovich v. Fridovich*, 598 So.2d 65, 70 (Fla. 1992), which provides that publication of defamatory material gives rise to one cause of action-defamation. Mot., p. 2. Other torts that arise from the allegedly false and defam-

atory material must be considered as part of the same claim, *i.e.*, a single action. Because the Court declines to dismiss the defamation claim for lack of § 770.01 notice, the Court need not discuss the single-action rule in depth here.

defendants," and the statute does not apply to private persons simply because technology now enables those individuals to publish information on the internet. Pls.' Resp., p. 8 [DE–21]. Plaintiffs suggest that *Alvi Armani* is inapposite and ask the Court to deny the request to dismiss this case for failure to give the pre-suit notice.

■ The parties' arguments have unnecessarily confused the issue. Whether the phrase "other medium" in § 770.01 includes the internet is not the critical issue here, and, in this Court's view, not even open for debate. That the internet constitutes a "other medium" for the purposes of § 770.01 should be well-settled. *See Alvi Armani*, 629 F.Supp.2d at 1307.[2] If the defendant in this case was the *Miami Herald* for example, it would make no difference that the alleged statements were found in the print or the online version of the paper. The medium through which Defendants made the statements then, is not dispositive here. Rather, the issue is whether these Defendants are the type of parties contemplated to receive pre-suit notice under § 770.01.

There is no dispute in Florida about who is entitled to receive pre-suit notice under § 770.01. Florida courts have recognized that the statute does not apply to private parties or nonmedia defendants. *Bridges v. Williamson*, 449 So.2d 400, 401 (Fla. 2nd DCA 1984). The Florida Supreme Court has explained that one of the objectives of the statute was to afford newspapers and periodicals an opportunity to make a full retraction to correct errors and avoid exposure to punitive damages. *Ross v. Gore*, 48 So.2d 412 (Fla.1950). Accordingly, § 770.01 does not extend to nonmedia defendants.

■ Thus, the question for this Court is whether the Defendants here should be considered media or nonmedia parties. *Mancini v. Personalized Air Conditioning & Heating, Inc.*, 702 So.2d 1376, 1380 (Fla. 4th DCA 1997)(media defendants are those individuals "engaged in the dissemination of news and information through the news and broadcast media[.]"). Turning to the Complaint, the Court finds no meaningful allegations that the Defendants were engaged in the dissemination of news and information. The Complaint provides that Daddy Yankee posted a press release on his personal website as well as Icaro's, both of which are available to the public. The Complaint provides no other allegations concerning any other information disseminated from the websites. For example, there is no indication that the websites ever disseminated any other information, whether it be traditional news or simply self-promotional or "infomercial" materials. Assuming that the press release constituted news, the one-time publication of that press release does not render Daddy Yankee or Icaro members of the news media. They are private parties with their own websites who released information about the cancellation of Daddy Yankee's tour on one occasion. Finding that Daddy Yankee and Icaro were media parties on these facts would abolish any distinction between private parties and members of the media.[3] Accordingly, the Court must deny Defendants request to dismiss Counts 5–9 for Plaintiffs' failure to provide

---

2. Citing *Canonico v. Calloway*, 35 Med. L. Rptr. 1549 (Fla.Cir.Ct. Feb. 22, 2007) and *Holt v. Tampa Bay Television, Inc.*, 34 Med. L. Rptr. 1540, 2006 WL 5063132 (Fla.Cir.Ct. Mar. 17, 2005), affd. by 976 So.2d 1106 (Fla. 2d DCA 2007).

3. Because the issue relates to the jurisdiction of the Court, Defendants could have introduced evidence to establish that they should be considered media parties, but did not do so.

Defendants with the requisite pre-suit notice.

## B. FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

Defendants also seek to dismiss Counts 2 and 5–9 for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6).

### 1. COUNT TWO (BREACH OF ORAL CONTRACT)

In order to state a cause of action for breach of an oral contract, a plaintiff is required to allege facts that, if taken as true, demonstrate that the parties mutually assented to "a certain and definite proposition" and left no essential terms open. *Rubenstein v. Primedica Healthcare, Inc.,* 755 So.2d 746, 748 (Fla. 4th DCA 2000).[4] Defendants argue that Plaintiffs failed to plead an essential term of the oral contract in Count Two, which involves the agreement to pay $480,000 to Defendants for the four additional concerts. Defs.' Mot., p. 11. Specifically, Defendants argue that Plaintiffs failed to plead when the $480,000 payment was due. The Court must reject this argument. Plaintiffs alleged that the parties initially agreed to the time and location of the concerts and the concert price, without establishing a specific date for payment. Compl., ¶¶ 48, 52. Plaintiffs further alleged that the parties supplied the missing term by expressly agreeing that payment would be made upon Daddy Yankee's arrival in Argentina. *Id.* ¶ 101. Plaintiffs therefore sufficiently pled when the payment of $480,000 was due. The only essential term that Defendants suggest is missing from the Complaint is actually included in the Plaintiffs' allegations.

Compl., ¶ 101. Accordingly, the motion to dismiss is denied as to Count Two.

### 2. COUNT FIVE (DEFAMATION)

While the Defendants seek to dismiss Plaintiffs' defamation claim for a variety of reasons, the Court believers the claim suffers from a more fundamental problem and would benefit from re-pleading. The elements of a claim for defamation are: "(1) the defendant published a false statement; (2) about the plaintiff; (3) to a third party; and (4) the plaintiff suffered damages as a result of the publication." *Fortson v. Colangelo,* 434 F.Supp.2d 1369, 1378 (S.D.Fla.2006). In a defamation case, "a plaintiff 'must allege certain facts such as the identity of the speaker, a description of the statement, and provide a time frame within which the publication occurred.'" *Morrison v. Morgan Stanley Props.,* No. 06–80751, 2008 WL 1771871, at *10 (S.D.Fla. Apr. 15, 2008) (quoting *Fowler v. Taco Viva, Inc.,* 646 F.Supp. 152, 157–58 (S.D.Fla.1986)). Plaintiff fails to allege facts to support any of the elements of a defamation claim.

The defamation claim here involves both the press release and a number of statements Baldiri purportedly uttered in the days or weeks following the November 17, 2010 announcement. With respect to the statements made by Baldiri, Plaintiffs failed to allege when those statements were made and failed to include a sufficient description of the statements. *See* Compl., ¶ 73–76. In one instance, Plaintiffs did not even attach the article containing the Baldiri's statements, but directed the Court to a website where they might be located. *Id.* at ¶ 74. In the absence of the necessary facts—when the statements

---

**4.** Plaintiff must also prove all the standard elements of a breach of written contract claim such as the existence of a contract, breach of that contract and damages resulting from the breach. *Assucrazioni Generali SPA v. Agility Logistics Corp.,* Case No. 08–22825, 2009 WL 4421262, *5 (S.D.Fla.2009).

were made—and an adequate description of the statements, the defamation claim as it relates to Baldiri's statements must be dismissed with leave to plead anew.

■ The defamation claim based on the press release must also be dismissed. Plaintiffs have alleged "on information and belief" that the statements made in the press release were made with the knowledge, consent and approval of all of the Defendants. Compl., ¶ 71. While this form of pleading is permitted, a plaintiff is still required to allege with particularity the factual basis upon which the information and belief was founded. Plaintiffs have merely alleged that the press release on Icaro's letterhead was published on Daddy Yankee and Icaro's website. There are not allegations, other than Plaintiffs' bare assertion on "information and belief" that would implicate EC Records, Ayala or Baldiri in the publication of those statements. Plaintiffs improperly attempt to supplement these factual allegations in their response brief to the motion to dismiss. Pls.' Resp., pp. 7–8. Those allegations, however, need to be contained in a pleading, not a response brief. Accordingly, the Court will dismiss the defamation claim with leave to re-plead. Because the claims for injurious falsehood and conspiracy are premised on the same conduct and allegations, the Court will also dismiss those claims without prejudice.[5]

### 3. COUNT SEVEN—INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Defendants also seek to dismiss Plaintiffs' IIED claim for failure to state a claim upon which relief can be granted. Florida has adopted § 46 of the Restatement (Second) of Torts as the appropriate standard for IIED claims. *Metro. Life Ins. Co. v.*

*McCarson,* 467 So.2d 277, 278–79 (Fla. 1985). Section 46 states that "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability." Restatement (Second) of Torts § 46. The commentary to § 46 explains that liability for IIED requires that

> the conduct [was] so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*Id.* at cmt. d. The Florida Supreme Court, however, has not elaborated further on what constitutes outrageous conduct for IIED purposes. *See Lopez v. Target Corp.,* 676 F.3d 1230 (11th Cir.2012). This Court must therefore look to decisions of Florida's district courts of appeal in interpreting Florida's outrageousness standard. *Id.*

■ Under those state court decisions, Plaintiffs have failed to state an IIED claim against Baldiri. Seeking additional bargaining leverage, threatening to breach a contract and encouraging third parties to disparage Plaintiffs simply does not rise to the level of outrageousness required to state an IIED claim in Florida. *See* Compl., ¶¶ 150–57. As an appellate court has explained, liability for IIED "does not extend to mere insults, indignities, threats, or false accusations." *Williams v. Worldwide Flight Servs. Inc.,* 877 So.2d 869 (Fla. 3d DCA 2004) (per curiam). Baldiri's alleged conduct, which

---

**5.** In filing an amended pleading, Plaintiffs' counsel would be well served in closely examining the nine causes of action from the original Complaint to determine whether adopting the same "kitchen sink" approach to pleading serves the best interests of the Court and the parties.

consists entirely of what may be aptly described as unprofessional and irresponsible, is not, as a matter of law, so atrocious or utterly intolerable as to rise to the level sufficient to state a claim for IIED. *See Nims v. Harrison,* 768 So.2d 1198, 1199 & n. 1 (Fla. 1st DCA 2000) (plaintiff stated a claim for IIED claim based on profane and racially derogatory language that included threats to kill the plaintiff and to rape her and her children.). Accordingly, Plaintiffs have failed to state a cause of action for intentional infliction of emotional distress.

### 4. COUNT EIGHT (FDUTPA)

Defendants assert that Plaintiffs' claim that they violated the Florida Deceptive and Unfair Trade Practices Act (FDUTPA) must be dismissed because Plaintiffs: (1) failed to allege unfair conduct; (2) included conduct that occurred outside of Florida; and (3) improperly seek special damages. Defs.' Mot., pp. 15–19 [DE–18]. Plaintiffs respond that the Complaint contains sufficient allegations of unfair conduct, identifies conduct that occurred within Florida and properly seeks lost profits. Pls.' Resp. pp. 12–16 [DE–21].

 To establish a claim under the FDUTPA, Plaintiffs must allege (1) a deceptive act or unfair practice, (2) causation, and (3) actual damages. *Rollins, Inc. v. Butland,* 951 So.2d 860, 869 (Fla. 2d DCA 2006). An unfair practice is one that offends established public policy and that is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. *Samuels v. King Motor Co. of Fort Lauderdale,* 782 So.2d 489, 499 (Fla. 4th DCA 2001). Plaintiffs have adequately alleged a FDUTPA claim against Defendants. Plaintiffs alleged that Defendants induced them to produce four additional concerts beyond the parties' original agreement under the threat of cancelling the all of the concerts even though Plaintiffs had advanced more than $820,000 for

those shows. According to the Plaintiffs, after agreeing to produce the additional shows and securing Defendants agreement that they would accept payment of $480,000 for the additional shows after arriving in Argentina, Defendants refused to fly to Argentina until they received the entire payment for the additional shows. Despite Defendants knowledge that Plaintiffs expended substantial sums in preparation of the shows, they canceled all of the concerts and publicly blamed Plaintiffs for the cancellation. Plaintiffs further alleged that the Defendants' press release and Baldiri's subsequent false statements ruined their business and stopped others from working with them on future projects. These acts and practices were deceptive, unfair, and caused Plaintiffs to be aggrieved. Moreover, Defendants' acts offend established public policy because they intentionally damaged Plaintiffs' reputation through publication of false representations concerning Plaintiffs' involvement in Daddy Yankee's Argentinean concerts. Plaintiffs have adequately pled the elements to state a claim for FDUTPA.

 While these facts are enough to state a claim for FDUTPA, the Court shares the Defendants' concern that the Complaint does not contain sufficient specificity for the location of the conduct giving rise to the FDUTPA claim. FDUTPA applies only to actions that occurred within the state of Florida. *Carnival Corp. v. Rolls–Royce PLC,* Case No. 08–23318, 2009 WL 3861450, *6 (S.D.Fla.2009) (Seitz, J.)(citing *Millennium Commc'ns & Fulfillment, Inc. v. Office of Attorney Gen.,* 761 So.2d 1256, 1262 (Fla. 3d DCA 2000)). Where Baldiri was located when he uttered any of the statements identified in the Complaint has not been pled. Nor is there any indication where the extra-contractual demands or the demands for prepayment of the $480,000 occurred. More-

over, Plaintiffs decision to lump all of the Defendants' actions together under a theory of concerted acts might be generally permissible, but has unnecessarily complicated this matter. The Court will grant the motion to dismiss the FDUTPA claim with leave to re-plead to specify the location of the conduct to make certain it occurred within the territorial boundaries of Florida. Should Plaintiffs include this claim in an amended pleading, Plaintiffs should also specify the acts committed by each Defendant, or, at a minimum, specify how certain Defendants ratified, approved or authorized the unfair acts.

 Assuming that Plaintiffs will re-file their FDUTPA claim, the Court will address the final argument Defendants raise that lost profits are not available for a FDUTPA claim. It remains well-settled in Florida that consequential damages in the form of lost profits are not recoverable under FDUTPA. *QSGI, Inc. v. IBM Global Financing*, Case No. 11–80880, *5, 2012 WL 1150402 (S.D.Fla.2012); *Eclipse Med., Inc. v. Am. Hydro–Surg. Instruments, Inc.*, 262 F.Supp.2d 1334, 1357 (S.D.Fla.1999) ("Florida courts specifically reject the recovery of consequential damages under FDUTPA."). Accordingly, Defendants' motion is granted and Plaintiffs' request for lost profits under FDUTPA is dismissed with prejudice.

## IV. CONCLUSION

Based on the foregoing, it is

ORDERED THAT

(1) Defendants' Motion to Dismiss Plaintiffs' Complaint [DE–18] is GRANTED to the extent that Counts Five, Six, Seven, Eight and Nine are DISMISSED WITHOUT PREJUDICE. Plaintiffs' request for lost profits under Count Eight (FDUTPA) is DISMISSED WITH PREJUDICE. The motion is DENIED as to Count Two. Plaintiff shall file an amended complaint on or before **July 16, 2012.**

(2) Defendants' Motion to Request Plaintiffs to Post Bond [DE–19] is DENIED. The Court has determined that Plaintiffs have stated a FDUTPA claim, but only dismissed the claim so that Plaintiffs can re-plead with additional specificity regarding the location of the unfair acts. Therefore the Court cannot conclude that the claim is patently frivolous, without legal or factual merit or that it has been brought for the purpose of harassment.

(3) Defendants' Motion for Hearing [DE–20] is DENIED.