GRIFFIN, J.
In this defamation case, Christopher Co-mins [“Comins”], appeals a trial court order entering partial final judgment in favor of Appellee/Cross-Appellant, Matthew VanVoorhis [“VanVoorhis”], for Comins’s failure to comply with the presuit notice requirement of section 770.01, Florida Statutes (2008). Comins argues that the trial court erred because VanVoorhis is not a “media defendant” and thus is not entitled to presuit notice. Alternatively, Co-mins contends that, even if VanVoorhis had been entitled to presuit notice, Van- *547 Voorhis waived that right by his efforts to remain anonymous.[1] We affirm.
This case arises out of a May 19, 2008 incident that involved Comins. According to various reports prepared by the Orange County Sheriffs Office, at around 4:30 p.m., people began to notify authorities that two wolves or dogs were in a pasture with cattle located near the intersection of State Road 417 and Narcoosee Road. Over the next two hours, the Orange County Sheriffs Office Communications Center received multiple calls. Some witnesses believed, at first, that the dogs were wolves; other witnesses stated that they knew the dogs were domestic animals because the dogs had collars. Witnesses reported observing the dogs circling and cornering the cattle, including a young calf. Some witnesses believed the dogs were just playing; others thought the dogs were acting in an aggressive manner. Eventually, reports came in that a man had shot the dogs. Twenty people were listed as witnesses to the shooting.
Comins, who is friends with the landowner, was driving past the pasture as these events were unfolding, and called to alert the landowner of the situation. According to Comins and the landowner, the landowner told Comins that animals attacking the cattle should be shot. Comins said he went into the pasture, was confronted by the dogs, felt threatened, and shot at the dogs six times. The following narrative was prepared by the Orange County Sheriffs Office in their investigative findings:
After the sixth shot at the dogs, an unknown man (later identified as Christopher Butler [the dogs’ owner]) to Co-mins ran into the pasture to protect and/or take control of the dogs. Statements indicate that Butler was yelling that the dogs were his though Comins said he was not aware that he was the actual owner nor did Comins hear Butler.
Comins looked at this person (Butler) while Butler was moving to cover one of the dogs. Comins then turned around and fired the seventh and final shot at the second dog.
Comins had turned his back on the second dog, placed his gun into his right back pocket and walked eleven steps away from this dog. He then turns around, pulls his gun and fires the seventh shot when the dog attempts to stand up as indicated in the original video.
Where Butler is physically in control of the first dog and the second dog is having difficulty standing or moving far, the need to continue shooting the second dog to protect the cattle is no longer required.
Turning around to shoot the second dog behind Comins’ back while Butler was present was unnecessary per Florida State Statute 828.12 [Cruelty to Animals].
Local news outlets, such as the Orlando Sentinel, WKMG Local 6, WESH Channel 2, and WFTV Channel 9, reported on the incident. Then, in early June 2008, a witness to the incident, who had caught the shooting on camera, posted the video of the shooting onto YouTube. Throughout the summer, the incident continued to be *548 reported in the news. Thousands of people signed an online petition, entitled “Justice for Husky Dogs Shot in Orange County, Florida,” demanding that Comins be charged with animal cruelty. Eventually, in late July, Comins was charged with one count of misdemeanor animal cruelty.
VanVoorhis learned about the incident from a Facebook group that had been created to express outrage over the incident. At this time, VanVoorhis had a bachelor’s degree in sociology from Indiana University, a master’s degree in sociology from the University of Florida, and was working towards his doctoral degree in sociology at the University of Florida. Since 2007, VanVoorhis had maintained a blog, entitled “Public Intellectual,” using the online blog platform, Word-Press.[2] He ran the blog under a pseudonym, M. Frederick Voorhees (his full legal name being Matthew Frederick VanVoo-rhis). VanVoorhis testified in his deposition that he founded the blog in order to “publicly comment on issues of public concern in an intellectual manner without tying my comments to my professional identity.” [3] VanVoorhis testified that he went by a pseudonym to protect his identity because, while a student, he wrote critiques of academia as an institution and its ability to connect with the public. Relying on the video itself and the online news articles reporting the incident, VanVoorhis published the blog posts at issue in this case.
Sometime in early 2009, Comins became aware of VanVoorhis’s blog posts. Comins traced the blog posts to the University of Florida’s computer network and, subsequently, through counsel, sent a letter [the “Killgore letter”] to “M. Frederick Voorhees” c/o the University of Florida on March 23, 2009. In this letter, Comins’s attorney, Frank H. Killgore, Jr. [“Attorney Killgore”], expressed concern over several death threats that individuals had made in the blog’s comments section and over the fact that Comins’s personal and business contact information had been posted in the comments section. Attorney Killgore requested that VanVoorhis delete the blog in its entirety or, at least, remove the death threats and all references to Comins’s contact information.[4] Comins then reported the blog post to the University of Florida Police Department, which contacted Van-Voorhis about Comins’s complaint.
Eventually, Comins obtained VanVoo-rhis’s full legal name and address. On May 13, 2009, Comins filed a four-count complaint against VanVoorhis for libel (Count I), libel per se (Count II), defamation by implication (Count III), and tor-tious interference with a business relationship (Count IV). Thereafter, VanVoorhis filed a counterclaim • against Comins for abuse of process and filed an answer and asserted eleven affirmative defenses to Co-mins’s complaint. At issue here is Van-Voorhis’s fifth affirmative defense that Co-mins failed to comply with the presuit notice requirement of section 770.01 before *549 filing the complaint against him. Section 770.01 provides:
Before any civil action is brought for publication or broadcast, in a newspaper, periodical, or other medium, of a libel or slander, the plaintiff shall, at least 5 days before instituting such action, serve notice in writing on the defendant, specifying the article or broadcast and the statements therein which he or she alleges to be false and defamatory.
§ 770.01, Fla. Stat. (2008). VanVoorhis also filed a motion to dismiss the lawsuit on this same basis. On September 10, 2010, the trial court held a hearing on the motion to dismiss. Comins’s counsel, Christopher M. Harne [“Attorney Harne”], told the trial court that presuit notice had been sent. Based on this representation, the trial court granted VanVoorhis’s motion to dismiss, but gave Comins leave to amend his complaint to properly plead compliance with the presuit notice requirement.
Comins’s first amended complaint alleged that “Plaintiff complied with Fla. Stat. § 770.01 in an abundance of caution by serving notice in writing on Defendant care of the University of Florida on March 23, 2009, identifying the articles which Plaintiff alleges to be false and defamatory.” Later, Comins filed a second amended complaint, which amended the presuit notice allegation to read:
Defendant is not a media defendant, and therefore Plaintiff was not required to provide him with pre-suit notice before instituting this action. However, even if this Court finds Defendant was entitled to pre-suit notice, which Plaintiff denies, Plaintiff has either satisfied all conditions precedent to bringing this lawsuit or such conditions have been waived or excused by Defendant’s conduct.
On March 1, 2011, VanVoorhis filed a motion for summary judgment on the pre-suit notice issue. The trial court held a hearing on VanVoorhis’s motion for summary judgment and ruled in favor of Van-Voorhis based on Comins’s failure to comply with the presuit notice requirement of section 770.01. The trial court said that “[t]he issue, then, is whether or a[sic] not Defendant’s blog falls under the rubric of ‘other medium’ as used in section 770.01.” Finding that “other medium” does include the internet, the trial court held that Co-mins was required to give VanVoorhis pre-suit notice under section 770.01. The trial court also rejected Comins’s waiver argument as having no factual or legal basis. We agree.[5]
On appeal, Comins argues that the trial court erred by ruling that Comins’s failure to comply with the presuit notice requirement of section 770.01 barred his claims because the section only applies to a “media defendant” and VanVoorhis is not a “media defendant.”
Although the express language of section 770.01 does not limit the type of defendant entitled to presuit notice, “[e]very Florida court that has considered the question has concluded that the presuit notice requirement applies only to ‘media defendants,’ not to private individuals.” Zelinka v. Americare Healthscan, Inc., 763 So.2d 1173, 1175 (Fla. 4th DCA 2000).
The “media defendant” issue arises because of certain language appearing in pri- or decisions of the Florida Supreme Court. In Jews for Jesus, Inc. v. Rapp, 997 So.2d 1098, 1112 (Fla.2008), the court com- *550 merited that “[u]nder Florida’s defamation law, a prospective plaintiff is required to give a media defendant notice five days before initiating a civil action.” However, this language does not necessarily mean that only media defendants are entitled to presuit notice under section 770.01.[6] The line of cases imposing the “media defendant” requirement rely mainly on the Florida Supreme Court’s much earlier opinion in Ross v. Gore, 48 So.2d 412 (Fla.1950).
Section 770.01 was originally enacted in 1933 and, until 1976, applied only to actions brought for publication of a libel in a newspaper or periodical:
Before any civil action is brought for publication, in a newspaper or periodical, of a libel, the plaintiff shall, at least five days before instituting such action, serve notice in writing on defendant, specifying the article, and the statements therein, which he alleges to be false and defamatory.
§ 770.01, Fla. Stat. (1950) (emphasis added). In Ross v. Gore, the Florida Supreme Court explained that one of the objectives of the Legislature when originally enacting the statute was to “afford to newspapers and periodicals an opportunity in every case to make a full and fair retraction in mitigation of the damages which a person may have suffered by reason of the publication.” 48 So.2d at 415. The issue in Ross was the constitutionality of section 770.01. One of the arguments advanced by the appellant was that the statute violated the equal protection clause of the Federal Constitution because it “grants a special privilege to newspapers and period-icals_” Id. at 414. In response to this argument, the Ross court discussed the purpose of granting newspapers and periodicals such “special privilege”:
The provision for retraction is peculiarly appropriate to newspapers and periodicals, as distinguished from, private persons. There is a valid difference in the classes, in this respect, which is sufficient to sustain the validity of the provision under the ‘equal protection’ clause.

Id.

Another argument advanced by the Ross appellants was that, in the absence of notice and a retraction, their suit for defamation should not have been dismissed but, rather, should have been limited to actual damages. According to the appellants, to construe the section as a condition precedent would be unconstitutional. Id. at 415. In response to this argument, the court held that the clear language of the statute established that notice was a condition precedent to suit. Id. The court reasoned that construing the statute otherwise would “defeat what must have been one of the objectives of the Legislature in enacting the statute.” Id. The court explained that the purpose of section 770.01 was “also to afford to newspapers and periodicals an opportunity in every case to make a full and fair retraction in mitigation of the damages which a person may have suffered by reason of the publication. This objective is a salutary one, and we do not think it constitutes unjust discrimination in favor of newspapers and periodicals.” Id.
*551 The discussion in Ross focused on the rationale for granting newspapers and periodicals the right to retraction. First, the court emphasized that “[t]he public has an interest in the free dissemination of news.” Id. The court stated:
In the free dissemination of news, then, and fair comment thereon, hundreds and thousands of news items and articles are published daily and weekly in our newspapers and periodicals. This court judicially knows that it frequently takes a legal tribunal months of diligent searching to determine the facts of a controversial situation. When it is recalled that a reporter is expected to determine such facts in a matter of hours or minutes, it is only reasonable to expect that occasional errors will be made. Yet, since the preservation of our American democracy depends upon the public’s receiving information speedily — particularly upon getting news of pending matters while there still is time for public opinion to form and be felt — it is vital that no unreasonable restraints be placed upon the working news reporter or the editorial writer.
Id. In other words, the Ross court determined that it is necessary in a democracy for the people to have speedy access to fact reporting and editorial comment. The Ross court was especially concerned that removing the safeguards of section 770.01 would result in a press that is “so inhibited that its great and necessary function of policing our society through reporting its events and by analytical criticism would be seriously impaired.” Id. at 415.[7]
In 1976, section 770.01 was amended to apply to actions brought for publication or broadcast of a libel or slander in a newspaper, periodical, or other medium. Perhaps the Legislature enacted this amendment to expand the protection of the section to include only radio and television broadcasts. Indeed, at that time, other sections of chapter 770 were amended to include explicit references to radio and television broadcasts. However, the amended language of section 770.01 was not so specific.
In Laney v. Knight-Ridder Newspapers, Inc., 532 F.Supp. 910 (S.D.Fla.1982), Judge King had to decide whether section 770.01 applied to protect the author of an allegedly defamatory letter to the editor that was published by Knight-Ridder Newspapers. The plaintiff in the case had not complied with the section’s presuit notice requirement as to the letter’s author, but argued that the requirement did not apply to nonmedia defendants. Id. at 912.
Judge King observed that:
[T]he provision fails to specify that notice need be provided only to media-defendants. If the legislature did intend to so limit the applicability of this provision, it seems logical that a specific restriction would have been inserted into the statute. One may reasonably infer from the generality of the language, therefore, that the statute requires notice to all potential defendants in an action for libel or slander.”
Id. Moreover, Judge King found that “it would be grossly unfair to construe the statute in such a way as to deny non-media defendants the opportunity to mitigate actual damages or avoid the assessment of punitive damages.” Id. at 913. This is so because “[njotice affords defendants the opportunity to issue a retraction or even to settle the overall conflict, thereby mitigating damages or eliminating litigation altogether. At the very least, notice may afford a non-media defendant the chance to consult with an attorney about legal *552 matters with which (s)he may be extremely unfamiliar.” Id.
In this ruling, Judge King acknowledged that the Florida Supreme Court’s decision in Ross “provides perhaps the strongest support for plaintiffs position.” However, Judge King stated that, “[w]hile the [Foss court] indirectly referred to the statute’s applicability in terms of newspapers and periodicals, it did not specifically describe the parameters of the statute’s applicability, nor, for that matter, provide sufficient justification for its decisions to discuss applicability solely in terms of newspapers and periodicals.” Id. at 912. Rather, “[t]he [Ross court] may very well have discussed the applicability of the statute in these terms simply because the defendants in the case were media-defendants.” Id. at 912 n. 6.
Judge King’s reasoning has since been rejected by other courts addressing this issue. In Bridges v. Williamson, 449 So.2d 400 (Fla. 2d DCA 1984), the Second District noted that the Ross court construed 770.01 “to apply exclusively to suits against newspapers and periodicals, as distinguished from private individuals.” Id. at 401. When section 770.01 was later amended, “the legislature was aware of Ross since it is presumed to be cognizant of the judicial construction of a statute when contemplating changes in the statute.” Id. (citing Seddon v. Harpster, 403 So.2d 409 (Fla.1981)). Thus, “[h]ad the legislature intended to extend the application of the statute to nonmedia defendants, it could have inserted such a provision into the statute at that time.” Id. Rather, “[t]he language of the statute is limited to newspapers, periodicals, and other media. Nowhere does the statute contain the words ‘nonmedia’ or ‘private individuals.’ ” Id.
A week after the Bridges opinion was published, the Third District published its opinion in Davies v. Bossert, 449 So.2d 418 (Fla. Bd DCA 1984), in which it also held that section 770.01 applies only to media defendants. In Davies, the court was confronted with whether the plaintiff was required to follow the 770.01 presuit notice requirement before filing suit for slander over “allegedly defamatory statements made by a private citizen [about a lobster fisherman he believed was stealing lobster from the nets of other fishermen] over an emergency channel of a citizen’s band radio.” Id. at 419. The Davies court held that this non-media defendant was not entitled to presuit notice under section 770.01. Id. at 421. Disapproving of Judge King’s ruling in Laney, the Davies court stated:
Although the issue before the Florida Supreme Court in Ross was different, the court unavoidably recognized that the statute had no application to non-media defendants. The main issue in Ross was whether the statute was discriminatory in that it permitted media defendants to avoid punitive damages by publishing a retraction or apology for libelous statements while not affording the same privilege to non-media defendants. The court did not hold, as does Laney, that section 770.01 applies to media and non-media libelees alike, but recognized that the unambiguous language of the statutory condition precedent applies only to media defendants. Ross, 48 So.2d at 414-15.
Id. at 420. Then, the Davies court examined the 1976 revision of the statute:
The earlier version of section 770.01, which was construed in Ross v. Gore, referred only to publication of a libel in a newspaper or periodical. In 1976, the statute was amended to include reference to (1) “broadcast” (in addition to “publication”), (2) “other medium” (in addition to “newspaper and periodical”),
*553 and (3) “slander” (in addition to “libel”). Ch. 76-123, § 1, Laws of Fla. The following additions were also made to Section 770.02: “or broadcast station” in the section’s heading; “or broadcast” (as an addition to “article”); and a reference to correction, apology, or retraction in the case of a broadcast. Section 770.03 was also amended so as to refer to broadcasting stations in general and not just to radio broadcasting stations. Section 770.04 refers specifically to the civil liability of an “owner, licensee, or operator of a radio or television broadcasting station, and the agents, or employees of any such owner, licensee or operator.” Since no other section of Chapter 770 uses the language “other medium” as found in section 770.01, we can infer reasonably that the legislature intended that term to include television and radio broadcasting stations. There is no logical reason to suppose that section 770.01 contemplates any form of medium not covered by other sections of the chapter. In the absence of legislative history, we can look to earlier enactments and other sections of the present Chapter 770 to determine the intent and meaning of the words “or other medium” in section 770.01. See Florida State Racing Commission v. McLaughlin, 102 So.2d 574 (Fla.1958) (if part of a statute appears to have a clear meaning if considered alone but when given that meaning is inconsistent with other parts of the same statute or others in pari material, the court will examine the entire act and those in pari material in order to ascertain the overall legislative intent); Wheeler v. Green, 286 Or. 99, 593 P.2d 777, 791 (1979) (in determining whether Oregon’s retraction statute’s reference to “publisher” was limited to a media entity, court looked to other provisions of the statute).
Id.; see also Gifford v. Bruckner, 565 So.2d 887 (Fla. 2d DCA 1990) (citing to Davies for the proposition that “other medium” includes only television and radio broadcasters).
The Davies court’s rationale was implicitly rejected in Nelson v. Associated Press, Inc., 667 F.Supp. 1468 (S.D.Fla.1987). In Nelson, the plaintiff relied on Davies and Bridges to argue that section 770.01 did not apply to dispatches transmitted by the Associated Press over their wire service. Id. at 1473-74. Rejecting the plaintiffs argument, Judge Spellman ruled that the language “other medium” should be read broadly to include wire services like the AP.
In Mancini v. Personalized Air Conditioning & Heating, Inc., 702 So.2d 1376 (Fla. 4th DCA 1997), the plaintiff had successfully argued to the trial court that section 770.01 did not apply to the defendant in the case. On appeal, the court rejected the plaintiffs argument:
To the extent [plaintiffs] argument is based on the fact that defendant is a full-time assistant state attorney as well as a part-time columnist, we discern no logical distinction between defendant and any other columnist. To the extent that plaintiff asserts that the statute is applicable only to actions against the newspaper itself, as opposed to the individuals writing for the newspaper, this restrictive interpretation of section 770.01 is not supported by the language of the statute.
Id. at 1378.
The Mancini opinion mainly concerns the plaintiffs argument that section 770.01 applies only to actions against the newspaper itself. Rejecting this argument, the Mancini court held that interpreting Ross to exclude reporters, editorial writers, and columnists from the protection of 770.01 would be “contrary not only to the plain language of the statute, but to the legisla *554 tive intent of the statute as expressed in Ross.” Id. The court further stated, “There is nothing in Ross to indicate that in using the term ‘newspaper’ our supreme court was referring only to the entity as distinguished from the individual columnists, reporters and editorial writers who write for the newspaper.” Id. Rather, the Maneini court observed that Ross emphasized that it is vital that no unreasonable restraints be placed upon the working news reporter or the editorial writer. Id. at 1379 (citing Ross, 48 So.2d at 415). Moreover, the Maneini court noted that “there is nothing in the language of the companion retraction provision, section 770.02, that would limit the protection to the newspaper publisher ....” Id. at 1379.
The Maneini court stressed that its interpretation of the scope of section 770.01 “does not conflict with the series of cases holding the statute does not apply to ‘non-media defendants’ ... [r]ather, the question is what is meant by ‘non-media defendant,’ a term not appearing within the statute, but only in case law.” Id. at 1380. The court explained:
The use of the phrase “non-media defendant” in these cases was not meant to distinguish between individuals and corporations, but rather to separate third parties who are not engaged in the dissemination of news and information through the news and broadcast media from those who are so engaged. In Davies the defendant, found to be a “non-media defendant,” was a private citizen who made the alleged defamatory statements over an emergency channel of a citizen’s band radio. In Bridges the court declined to extend the reach of the statute to protect a private individual whose allegedly libelous statement had been republished by the newspaper. In Gifford the “non-media defendant” was an aerial advertising firm being sued for a banner towed overhead by airplane. Most recently, in [Tobkin ] ... we held that the protection of section 770.01 did not cover individuals who sent letters to The Florida Bar.
According to the Maneini court, the scope of section 770.01’s protection is defined by separating third parties who are not engaged in the dissemination of news and information “through the news and broadcast media” from those who are so engaged.
In Ortega Trujillo v. Banco Central Del Ecuador, 17 F.Supp.2d 1334 (S.D.Fla. 1998), Judge King sought to do just that. In Ortega Trujillo, the defendant — a public-relations firm in the business of public relations and lobbying for its clients— sought protection under section 770.01 for a press release it published that contained allegedly defamatory statements. Rejecting the defendant’s contention that it qualified as a media defendant, Judge King explained that “[b]y definition, all news media disseminates information, but it is a syllogism to conclude ... that all those who disseminate information automatically qualify as news media.” Id. at 1338.
Attempting to define the scope of “news media,” Judge King stated:
The function of the media is to inform and to initiate “ ‘uninhibited, robust, and wide-open’ debate on public issues.” See Gertz v. Robert Welch, Inc., 418 U.S. 323, 339, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) (citing New York Times Co. v. Sullivan, 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)).
Id. Judge King found that the defendant was in the business of public relations and lobbying, and so could not fall within the definition of media, no matter how “nebulous” that definition is. Id. In particular, the defendant “does not impartially disseminate information. Nor, for that matter, does it issue unsolicited, disinterested *555 and neutral commentary as to matters of public interest, or editorialize as to matters of public interest without being commissioned to do so by its clients.” Id.
Eventually, our courts were confronted with cases involving defamatory statements made over the internet. In Zelinka, 763 So.2d at 1173, the court had to decide whether a plaintiff in a libel action arising out of a posting on an internet “message board” was required to comply with the presuit notice requirements of section 770.01. Ultimately, the court held that the defendant was “a mere internet-using, private individual,” and not a media defendant to which the presuit notice requirements apply. Id.
The facts of Zelinka were as follows:
Respondents, Amerieare Healthscan, Inc., Amerieare Diagnostics, Inc., and Dr. Joseph P. D’Angelo, filed a four-count complaint against petitioner, Robert Zelinka, and other defendants, alleging in counts I and II libel per se and libel per quod based on the publication of allegedly false and defamatory statements on an internet “message board.” The complaint alleges that the board where the messages were posted is maintained for the purpose of transmitting information about Technical Chemicals and Products, Inc., a corporation which was involved in litigation with the respondents. Zelinka was not alleged to be the owner or operator of the web site where the bulletin board was located.
Id. at 1174. The petitioner/defendant argued that the internet is an “other medium” within the meaning of the statute, but the Zelinka court declined to reach that issue. Rather, the court held that “[e]ven if an internet bulletin board was a ‘medium’ within the scope of the statute, no precedent would allow this court to extend the statutory notice requirement to a private individual who merely posts a message on the board.” Id. at 1175. The court characterized the petitioner/defendant in that case as being in “the same position as that of the private individuals in the Davies, Bridges and Gifford cases, whose statements were “broadcast’ to the public, but who themselves were not members of ‘the media.’” Id. However, the Zelinka court did acknowledge, in dictum, that “[i]t may well be that someone who maintains a web site and regularly publishes internet ‘magazines’ on that site might be considered a ‘media defendant’ who would be entitled to notice.” Id.
Such a defendant was found to be entitled to presuit notice in AM Armani Medical, Inc. v. Hennessey, 629 F.Supp.2d 1302 (S.D.Fla.2008). In AM, the defendant was the owner, host, and publisher of a website called the “Hair Restoration Network,” which was identified as being “dedicated to providing information to the consumer public about the hair restoration and transplant industry.” Id. at 1303-04. The defendant claimed that the defamation suit should be dismissed because the plaintiffs had failed to comply with section 770.01. The defendant argued that “notice was required in this case because the ‘other medium’ language used in section 770.01 includes the internet and internet forums such as the website at issue in this case.” Id. at 1307. The plaintiffs, on the other hand, argued that the “other medium” of section 770.01 was intended to include only television and radio broadcasting stations, and thus no notice was required in their ease. Id.
In deciding whether section 770.01 applied to the defendant, Judge Lenard first acknowledged that “[w]hether the internet is included as part of the ‘other medium’ language ... is an issue that has not been definitively resolved by the Supreme Court of Florida ....” However, Judge Lenard found to be persuasive two Florida lower *556 court decisions, Canonico v. Calloway, 35 Med. L. Rptr. 1549 (Fla.Cir.Ct. Feb. 22, 2007), and Holt v. Tampa Bay Television, Inc., 34 Med. L. Rptr. 1540, 1542 (Fla.Cir. Ct. Mar. 17, 2005), aff'd by 976 So.2d 1106 (Fla. 2d DCA 2007). In Canónico, the trial court dismissed the plaintiffs defamation claim relating to statements made on the internet because the plaintiff had not complied with section 770.01. In Holt, the trial court rejected the plaintiffs contention that section 770.01 does not apply to stories published on the internet, even by a media defendant.
Judge Lenard pointed out that “all of the cases cited by Plaintiffs in support of their argument — with the exception of [Ze-linka ] — pre-date, by at least a decade, the use of the internet by the general public, and do not directly address whether the internet is considered in the category of ‘other medium’ as contemplated by section 770.01.” Id. at 1308. Judge Lenard further ruled that Zelinka was inapposite to the case because the Alvi defendant was not a “private individual who merely posts a message on [an internet] board.” Id. Rather, “Plaintiffs have brought suit against a company that allegedly owns, hosts and publishes the offending website, which provides information to the consumer public, and against the principal owner of that website, who is alleged to control the website’s operations.” Id.
Most recently, in Five for Entertainment, S.A. v. Rodriguez, 877 F.Supp.2d 1321 (S.D.Fla.2012), a concert promoter sued the defendants, a Reggaeton musician [“Daddy Yankee”] and his booking agency, for defamation resulting from a press release that the defendants posted on their respective websites. Relying on Alvi, the defendants argued that the publication of the allegedly defamatory statements on their websites fell within the “other medium” language of section 770.01. Id. at 1326. In response, the plaintiffs argued that section 770.01’s protection did not apply to the defendants “simply because technology now enables those individuals to publish information on the internet.” Mat 1326-27.
When deciding the issue, Judge Seitz first pointed out that the parties’ arguments had “unnecessarily confused the issue.” Id. at 1327. Judge Seitz said:
Whether the phrase “other medium” in § 770.01 includes the internet is not the critical issue here, and, in this Court’s view, not even open for debate. That the internet constitutes a “other medium” for the purposes of § 770.01 should be well-settled. See Alvi Armani, 629 F.Supp.2d at 1307. If the defendant in this case was the Miami Herald for example, it would make no difference that the alleged statements were found in the print or the online version of the paper. The medium through which Defendants made the statements then, is not dispositive here. Rather, the issue is whether these Defendants are the type of parties contemplated to receive pre-suit notice under § 770.01.
There is no dispute in Florida about who is entitled to receive pre-suit notice under § 770.01. Florida courts have recognized that the statute does not apply to private parties or nonmedia defendants. Bridges v. Williamson, 449 So.2d 400, 401 (Fla. 2d DCA 1984). The Florida Supreme Court has explained that one of the objectives of the statute was to afford newspapers and periodicals an opportunity to make a full retraction to correct errors and avoid exposure to punitive damages. Ross v. Gore, 48 So.2d 412 (Fla.1950).
Id. “Accordingly, § 770.01 does not extend to nonmedia defendants.” Id. With that stated, Judge Seitz went on to rule on whether the defendants in the case were *557 “nonmedia” defendants, and thus not entitled to the protection of section 770.01. Ultimately, Judge Seitz found that the defendants were “nonmedia” defendants. Specifically, Judge Seitz made the following findings:
Turning to the Complaint, the Court finds no meaningful allegations that the Defendants were engaged in the dissemination of news and information. The Complaint provides that Daddy Yankee posted a press release on his personal website as well as Iearo’s, both of which are available to the public. The Complaint provides no other allegations concerning any other information disseminated from the websites. For example, there is no indication that the websites ever disseminated any other information, whether it be traditional news or simply self-promotional or “infomerical” materials. Assuming that the press release constituted news, the one-time publication of that press release does not render Daddy Yankee or Icaro members of the news media. They are private parties with their own websites who released information about the cancellation of Daddy Yankee’s tour on one occasion. Finding that Daddy Yankee and Icaro were media parties on these facts would abolish any distinction between private parties and members of the media.

Id.

With this emerging legal landscape in mind, we turn to the case here, where the trial court granted summary judgment in favor of VanVoorhis because it determined that the words “other medium” of section 770.01 were expansive enough to include the internet and a blog, and that VanVoorhis’s blog falls under the rubric of “other medium.” In support of this ruling, the trial court cited to the Alvi decision, which applied section 770.01 to a defendant who made defamatory statements on his website, where his website was owned and operated for the purpose of providing consumer information on the hair restoration and transplant industry. Comins argues that the trial court erred by only considering whether the internet blog is a “medium” under section 770.01 and not whether VanVoorhis is a “media defendant.”
Important to the analysis here is the Ross court’s discussion of the legitimate government interest in requiring presuit notice as a condition precedent under section 770.01. In support of its finding that the condition precedent was a valid exercise of the legislature’s power, the court emphasized the need for the free dissemination of news and fair comment thereon in order for the public to obtain as much information about a particular event as possible before forming an opinion. Not only did the court emphasize the importance of the dissemination of facts, but it also emphasized the importance of the dissemination of “fair comment” and “analytical criticism.” The court said that “it is vital that no unreasonable restraints be placed upon the working news reporter or the editorial writer.” Ross, 48 So.2d at 415 (emphasis added).
In answering the question whether Van-Voorhis’s blog and blog posts come within the purview of the prescribed “other medium” entitled to presuit notice, we look to the Ross decision to determine whether the blog is operated to further the free dissemination of information or disinterested and neutral commentary or editorializing as to matters of public interest. Van-Voorhis contends that blogs like “Public Intellectual” have “stepped into the void left by a shrinking print industry, and perform the same important function — delivering news, information, and commentary to the masses.” On the other hand, Comins characterizes VanVoorhis as mere *558 ly an individual “writing from his apartment under a pseudonym in between studying for his classes, [who] was under no pressure whatsoever to deliver any information at all, much less to deliver it quickly.”
As early as 2005, Judge Posner discussed the changing face of news media brought about by the internet:
The latest, and perhaps gravest, challenge to the journalistic establishment is the blog. Journalists accuse bloggers of having lowered standards. But their real concern is less high-minded — it is the threat that bloggers, who are mostly amateurs, pose to professional journalists and their principal employers, the conventional news media. A serious newspaper, like The Times, is a large, hierarchical commercial enterprise that interposes layers of review, revision and correction between the reporter and the published report and that to finance its large staff depends on advertising revenues and hence on the good will of advertisers and (because advertising revenues depend to a great extent on circulation) readers. These dependences constrain a newspaper in a variety of ways. But' in addition, with its reputation heavily invested in accuracy, so that every serious error is a potential scandal, a newspaper not only has to delay publication of many stories to permit adequate checking but also has to institute rules for avoiding error — like requiring more than a single source for a story or limiting its reporters’ reliance on anonymous sources — hat cost it many scoops.
Blogs don’t have these worries. Their only cost is the time of the blogger, and that cost may actually be negative if the blogger can use the publicity that he obtains from blogging to generate lecture fees and book royalties. Having no staff, the blogger is not expected to be accurate. Having no advertisers (though this is changing), he has no reason to pull his punches. And not needing a large circulation to cover costs, he can target a segment of the reading public much narrower than a newspaper or a television news channel could aim for. He may even be able to pry that segment away from the conventional media. Blogs pick off the mainstream media’s customers one by one, as it were.
And bloggers thus can specialize in particular topics to an extent that few journalists employed by media companies can, since the more that journalists specialized, the more of them the company would have to hire in order to be able to cover all bases. A newspaper will not hire a journalist for his knowledge of old typewriters, but plenty of people in the blogosphere have that esoteric knowledge, and it was they who brought down Dan Rather. Similarly, not being commercially constrained, a blogger can stick with and dig into a story longer and deeper than the conventional media dare to, lest their readers become bored. It was the bloggers’ dogged persistence in pursuing a story that the conventional media had tired of that forced Trent Lott to resign as Senate majority leader. What really sticks in the craw of conventional journalists is that although individual blogs have no warrant of accuracy, the blogosphere as a whole has a better error-correction machinery than the conventional media do. The rapidity with which vast masses of information are pooled and sifted leaves the conventional media in the dust. Not only are there millions of blogs, and thousands of bloggers who specialize, but, what is more, readers post comments that augment the blogs, and the information in those comments, as in the blogs them *559 selves, zips around blogland at the speed of electronic transmission.
This means that corrections in blogs are also disseminated virtually instantaneously, whereas when a member of the mainstream media catches a mistake, it may take weeks to communicate a retraction to the public. This is true not only of newspaper retractions — usually printed inconspicuously and in any event rarely read, because readers have forgotten the article being corrected — but also of network television news. It took CBS so long to acknowledge Dan Rather’s mistake because there are so many people involved in the production and supervision of a program like “60 Minutes II” who have to be consulted.
Richard A. Posner, Bad News, N.Y. Times, July 81, 2005 (book review), at 1, 10.[8]
Agree or disagree with Judge Pos-ner’s characterization of the travails of “conventional media” and the virtues of blogs, it is hard to dispute that the advent of the internet as a medium and the emergence of the blog as a means of free dissemination of news and public comment have been transformative. By some accounts, there are in the range of 300 million blogs worldwide.[9] The variety and quality of these are such that the word “blog” itself is an evolving term and concept. The impact of blogs has been so great that even terms traditionally well defined and understood in journalism are changing as journalists increasingly employ the tools and techniques of bloggers— and vice versa. In employing the word “blog,” we consider a site operated by a single individual or a small group that has primarily an informational purpose, most commonly in an area of special interest, knowledge or expertise of the blogger, and which usually provides for public impact or feedback. In that sense, it appears clear that many blogs and bloggers will fall within the broad reach of “media,” and, if accused of defamatory statements, will qualify as a “media defendant” for purposes of Florida’s defamation law as discussed above.
There are many outstanding blogs on particular topics, managed by persons of exceptional expertise, to whom we look for the most immediate information on recent developments and on whom we rely for informed explanations of the meaning of these developments. Other blogs run the gamut of quality of expertise, explanation and even-handed treatment of their subjects. We are not prepared to say that all blogs and all bloggers would qualify for the protection of section 770.01, Florida Statutes, but we conclude that VanVoo-rhis’s blog, at issue here, is within the ambit of the statute’s protection as an alternative medium of news and public comment.
*560 The trial court properly determined that VanVoorhis was entitled to presuit notice under section 770.01. The presuit notice requirement of section 770.01 applies to allegedly defamatory statements made in such a public medium the purpose of which is the free dissemination of news or analytical comment on matters of public concern, as suggested in Ross. The trial court correctly entered judgment in favor of VanVoorhis.
AFFIRMED.
LAWSON and COHEN, JJ., concur.

. In his cross-appeal, VanVoorhis appeals a trial court order denying his motion for sanctions under the trial court’s inherent authority and under section 57.105, Florida Statutes (2011) [the "57.105 motion”]. VanVoorhis argues that the trial court erred by denying the 57.105 motion because Comins's counsel misrepresented to the court that presuit notice under section 770.01 had been given. We affirm the cross-appeal without further comment.

. WordPress is a free blog and web hosting service, en.wordpress.com/tos/. VanVoorhis’s blog can be located at www.publicintellectual. wordpress.com.

. VanVoorhis also testified in his deposition that "Public Intellectual” had won "The Thinking Blogger Award” (a weekly blogger award given to a thoughtful blog post) for an article, entitled The McDonaldization of Citizenship. VanVoorhis testified that the article applied a theory from George Ritzer’s book "The McDonaldization of Society” to the idea of citizenship, and what it means to be an active citizen in the United States.

.Comins contends that the Killgore letter was sufficient to meet the requirements of section 770.01, Florida Statutes; however, this letter fails in its essential function to notify the defendant that the article was false and defamatory.

. The record shows that it was not very difficult to find and to communicate with Van-Voorhis. Failing any other alternative, Co-mins could have posted a retraction notice in the comments section of VanVoorhis’s blog. We approve the trial court's conclusion as to waiver without further comment.

. Indeed, the Florida Supreme Court has held that section 770.07, which establishes the point in time when a cause of action for defamation accrues, applies to both media and private individual defendants. Wagner, Nugent v. Flanagan, 629 So.2d 113, 115 (Fla. 1993). The Wagner court acknowledged that chapter 770 primarily addresses media defendants, but the court pointed out that the chapter is broadly titled "Civil Actions for Libel" and that limiting section 770.07 to media defendants only "would allow potentially endless liability since Florida Statutes contains no statute of repose for this particular lort.” Id.

. The Ross court observed that it was the Legislature's prerogative whether to include radio broadcasting stations within the terms of the statute. Id. at 414.

. See also Mortgage Specialists, Inc. v. Implode-Explode Heavy Industries, Inc., 160 N.H. 227, 999 A.2d 184 (2010), where the Supreme Court of New Hampshire was asked to determine whether a company that operates a website that ranks various businesses in the mortgage industry and allows visitors who register on the site and create usernames to post publicly viewable comments about lenders, was a "news organization” entitled to constitutional protection. In holding that Implode-Explode was a news organization entitled to constitutional protection, the court explained:
Although our cases discussing the news-gathering privilege have involved traditional news media, such as newspapers, see, e.g., Keene Pub. Corp., 117 N.H. at 960, 380 A.2d 261, we reject Mortgage Specialists’ contention that the newsgathering privilege is inapplicable here because Implode is neither an established media entity nor engaged in investigative reporting.
Id. at 189.

. See Wikipedia, Blog, http://en.wikipedia/ wiki/Blog (as of March 24, 2014, 15:29 GMT).